Civil Action No. 24-CV-2728-X

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

In re: JRjr33, Inc.,
*Debtor*.

ROBERT YAQUINTO, IN HIS CAPACITY AS CHAPTER 7
TRUSTEE OF JRJR33, INC.,

*Appellant*,

v.

CNA INSURANCE COMPANIES D/B/A
CONTINENTAL CASUALTY COMPANY,

*Appellee*,

On Appeal from the United States Bankruptcy Court for the Northern District of
Texas, Case No. 23-3086, Hon. Stacey G.C. Jernigan, Presiding

## APPENDIX IN SUPPORT OF BRIEF OF APPELLANT
## ROBERT YAQUINTO, IN HIS CAPACITY AS
## CHAPTER 7 TRUSTEE OF JRJR33, INC.

Kevin D. McCullough
ROCHELLE MCCULLOUGH, LLP
325 N. St. Paul Street
Suite 4500
Dallas, Texas 75201
T: (214) 953-0182
F: (214) 953-0185

Mazin A. Sbaiti
Caleb A. Davis
Griffin S. Rubin
Sbaiti & Company PLLC
2200 Ross Avenue
Suite 4900W
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367
mas@sbaitilaw.com

**APPENDIX**

| Tab | ECF No. | Document | Record Citation | Appendix Pages |
|---|---|---|---|---|
| 1 | 1 | Original Complaint | 000036 – 000046 | APP_001 - 011 |
| 2 | 10 | Defendant's Original Answer to Plaintiff's Original Complaint | 000049 – 000062 | APP_012 - 025 |
| 3 | 39 | Memorandum Opinion and Order Granting Rule 12(c) Motion | 000307 - 000319 | APP_026 - 038 |
| 4 | 53 | Final Judgment | 000305 - 000306 | APP_039 - 040 |
| 5 | 43 | Notice of Appeal and Statement of Election | 000001 - 000003 | APP_041 - 043 |
| 6 | 51 | Transcript of Hearing on Rule 12(c) Motion for Judgment on the Pleadings Filed by Defendant CAN Insurance Companies | 000238 - 000304 | APP_044 - 110 |

Dated: January 16, 2025          Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/ Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 2405809
**Caleb A. Davis**
Texas Bar No. 24099666
**Griffin S. Rubin**
Texas Bar No. 24121809
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
   caleb.davis@sbaitilaw.com
   gsr@sbaitilaw.com

-AND-

Kevin D. McCullough
Texas Bar No. 00788005
**R**OCHELLE **M**c**CULLOUGH, LLP**
325 N. St. Paul Street, Suite 4500
Dallas, TX 75201
T: (214) 953-0182
F: (214-953-0185
E: kdm@romclaw.com

**COUNSEL FOR APPELLANT**

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2025, a true and correct copy of the foregoing was served via the Court's CM/ECF system on counsel for Appellee.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

Mazin A. Sbaiti
Texas Bar No. 24058096
SBAITI & COMPANY PLLC
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com

Litigation Counsel for Adversary Plaintiff

Kevin D. McCullough
Texas Bar No. 00788005
Rochelle McCullough, LLP
325 N. St. Paul Street, Suite 4500
Dallas, TX 75201
T: (214) 953-0182
F: (214) 953-0185
E: kdm@romclaw.com

Bankruptcy Counsel for Adversary Plaintiff

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

## DALLAS DIVISION

| | |
|---|---|
| IN RE:<br><br>JRjr33, Inc.<br><br>   Debtor.<br>_____<br><br>ROBERT YAQUINTO, In His Capacity as<br>Chapter 7  Trustee of JRjr33, Inc.<br><br>   Plaintiff,<br><br>v.<br><br>CNA INSURANCE COMPANIES dba<br>CONTINENTAL CASUALTY COMPANY,<br><br>   Defendant. | **Case No. 18-32123-SGJ-7**<br><br>**Chapter 7**<br><br><br><br><br><br><br><br>**Adversary No. _____**<br><br>JURY TRIAL REQUESTED |

## ORIGINAL COMPLAINT

Plaintiff Robert Yaquinto, Chapter 7 Trustee of JRjr33, Inc. brings this Adversary action as

assignee of all claims belonging to ActiTech LP ("Yaquinto" or "Plaintiff") against Defendant CNA

Insurance Companies dba Continental Casualty Company, an insurance company ("Continental"

1

or "Defendant") for claims of breach of contract, bad faith, and breach of other statutory and common law duties.

## I.

## PARTIES

1.     Plaintiff Robert Yaquinto is the Chapter 7 Trustee of JRjr33, Inc. which is a party in bankruptcy in the Northern District of Texas. Prior to bankruptcy, JRjr22, Inc. was in business with its principal place of business in Dallas County, Texas.

2.     Defendant CNA Insurance dba Continental Casualty Company ("Continental"), an insurance company has as its principal place of business 333 S. Wabash Ave., Chicago, IL 60604.

3.     Non-party ActiTech LP is a Texas limited partnership in Chapter 11 bankruptcy in the matter *In Re: ActiTech, LP*, Case No. 22-30049-sgj-11 ("ActiTech"), which is proceeding before this Court. ActiTech's principal place of business is (or was) in Sherman, Texas. ActiTech was a named insured through a policy held by ActiPrime Inc., Policy No. 425594086 (the "Policy"). ActiTech assigned all of its rights and claims against Continental to Plaintiff to resolve its dispute with Agel in this Court in the adversary proceeding *JRjr33 Inc. v. Michael Bishop, et al.*, Adversary No. 22-03002-sgj-11.

4.     Non-Party Agel Enterprises, LLC ("Agel") is a wholly-owned subsidiary of JRjr33, Inc., and was a plaintiff in an adversary lawsuit with ActiTech in this Court, in the adversary proceeding *JRjr33 Inc. v. Michael Bishop, et al.*, Adversary No. 22-03002-sgj-11.

## II.

## VENUE AND JURISDICTION

5.     Venue is proper in this jurisdiction because some or all of the events underlying this action occurred in this district and is related to a bankruptcy proceeding.

2

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1332(a) because there is complete diversity between the parties and the amount in controversy
exceeds $75,000. This Court also has subject matter jurisdiction under 28 U.S.C. § 1334(b) and
(e) because the matter is related to two bankruptcy proceedings and, specifically, the JRjr33, Inc.
bankruptcy.

7.      This Court has personal jurisdiction over Continental because it contracted within
the state and committed torts within the state, and such contacts give rise to the causes of action
herein.

### III.

### FACTUAL BACKGROUND

#### A. THE AGEL LAWSUIT

8.      On or about November 3, 2017, JRjr33 Inc. and Agel filed the underlying lawsuit
against ActiTech in the 116th Judicial District Court, Dallas County, in the matter *JRjr33, Inc. and
Agel Enterprises, Inc., v. Michael Bishop et al.* Cause No. DC-17-15206 (the "underlying suit").

9.      The basis of the suit was simple: it alleged that ActiTech had committed usury in
violation of Texas law and the Texas usury statute (TEX. FIN. CODE § 305.003 et seq.). Specifically,
ActiTech had extended credit terms to Agel for certain deliveries of manufactured goods, and the
effective rate of the payments owed on top of the amounts forborne exceeded 100% effective
annual interest.

10.     Texas usury law provides for cancellation of the unlawful debt, treble damages, and
attorneys' fees if someone charges more than the lawful amount of interest.

11.     On or about October 26, 2021, the Dallas District Court entered a preliminary
injunction in favor of Agel, prohibiting the dissipation of over $11 million and confirming Agel's

3

theory of liability and the amount of damages.

12.     On or about January 10, 2022, ActiTech filed bankruptcy in the Northern District of Texas. *In re ActiTech LP*, Chapter 11, Case No. 22-30049-11-sgj11.

13.     ActiTech immediately removed the case to the bankruptcy court in the ActiTech bankruptcy and set up the adversary proceeding *ActiTechJRjr33, Inc. and Agel Enterprises, Inc. v. Michael A. Bishop, et al*, Adversary No. 22-03002, and immediately sought to vacate the injunction and dismiss the case on the merits. These motions were denied by the Bankruptcy Court.

**B.   THE STOWERS DEMAND/BAD FAITH**

14.     On or about June 7, 2021, Agel, via its then-counsel, J. Michel Zapendowski, sent a Stowers demand on behalf of Agel for policy limits.

15.     Continental ignored the offer of settlement within policy limits. At the time, policy limits were capped at $1 million.

16.     The Stowers demand specifically laid out the bases of the claims, all of which had been confirmed by the District Court in its injunction order.  The Policy covers ActiTech's usury violation, when ActiTech did not actually receive any usurious interest payments, but merely contracted for them, and did so unintentionally. The evidence supporting ActiTech's liability, greatly in excess of policy limits, was overwhelming and indisputable.  Continental nonetheless ignored (and thereby rejected) a reasonable offer to settle within the policy limits, thus exposing its insured to liability in excess of the policy limits at the time.

17.     At the time, ActiTech had no expert who could defend the financial arrangement as anything but usurious.

18.     The Policy clearly provides coverage for the usury claim asserted against ActiTech, and there are no applicable policy exclusions. Agel's usury claim also did not fall under the

4

"intentional acts" exclusion. This exclusion applies where: "Insureds committed any fraudulent or criminal Wrongful Act with actual knowledge of its wrongful nature or with intent to cause damage." It is clear, under Texas law, that usury does not have to result from an intentional act. Indeed, before it was repealed, there was a statutory defense to usury in Texas on the grounds that the violation was unintentional. See *Moore v. White Motor Credit Corp.*, 708 S.W.2d 465, 473 (Tex. App.—Dallas 1985, writ denied) (finding that usury violation was unintentional); *see also Seitz v. Lamar Sav. Assoc.*, 618 S.W.2d 142, 143 (Tex. App.—Austin 1981, writ denied). Although the statutory defense has since been repealed, it is clear, under Texas law, that usury can be unintentional.

19.     And the Policy's "illegal profits" exclusion only applies where "Insureds in fact gained any profit, remuneration or pecuniary advantage to which they were not legally entitled." Policy at pdf 28. However, Agel's usury claim against ActiTech does not allege that ActiTech actually received unlawful interest payments; merely that it unlawfully contracted for illegal interest and also charged illegal interest. The Texas Finance Code imposes usury liability on any person or entity who "contracts for or receives interest that is greater than the amount authorized." § 305.001(a-1) (emphasis added). Thus,  it cannot be argued that engaging in a usurious transaction granted ActiTech any pecuniary advantage. Indeed, Agel's Petition against ActiTech alleges that by engaging in a usurious transaction—and incurring millions of dollars in liability as a result—ActiTech rendered itself insolvent. No authority nationwide supports the application of an illegal profits exclusion to a usury claim when no unlawful interest was received by the insured. Importantly, the Stowers demand took pains to show that liability under the usury statute did not require a showing of intentional tortious or criminal conduct.

20.     Therefore, the Policy coverage is there and no exclusion applies.

APP_005

## C. THE SETTLEMENT

21.     On or about July 20, 2022, JRjr33, Agel and ActiTech reached a settlement wherein ActiTech agreed to pay JRjr33 and Agel $2,750,000 in damages and assigned JRjr33 all rights, interest and claims under the Policy related to the underlying lawsuit.

22.     Specifically, ActiTech  informed Agel that Continental had failed to tender a defense for ActiTech,  had not paid all attorneys' fees, and had denied coverage for any liability. Based upon such representation, ActiTech assigned the rights and claims under the Policy to JRjr33 at the time of settlement.

23.     The parties filed a Motion to Approve Settlement Agreement, and the Bankruptcy Court signed an Order approving the Settlement Agreement on October 7, 2022. The assignment is therefore valid and enforceable.

24.     JRjr33, Inc. brings this action as assignee.

## II.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### BREACH OF CONTRACT AND/OR
#### IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

25.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

26.     The Policy was a valid contract between ActiTech and Defendant Continental.

27.     The policy underwriter sold the Policy to ActiTech and represented that Continental would pay the policy amounts for a covered loss after it became reasonably clear that Plaintiff's claim was valid and covered by the Policy.

28.     Defendant breached the contract by not paying for a covered loss after it became reasonably clear that Plaintiff's claim was valid and covered by the Policy.

APP_006

000041

29.     Defendant breached the implied covenant of good faith and fair dealing by failing to accept the Stowers demand and other reasonable offers of settlement and by refusing to make any reasonable offer of settlement within policy limits, and by denying coverage for liability or not accepting coverage for liability, and/or not tendering a full and complete defense of the underlying lawsuit.

30.     This is especially so after receiving the Stowers demand.

31.     Defendant's breaches resulted in ActiTech incurring attorneys' fees and liability that had to be settled via a $2.75 million payment to JRjr33.

32.     Therefore, Defendant is liable for damages and attorneys' fees under Texas law.

### SECOND CAUSE OF ACTION
#### VIOLATIONS OF CHAPTER 541 OF
#### TEXAS INSURANCE CODE

33.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

34.     Upon information and belief, ActiTech gave notice of the underlying suit and demanded the benefits of coverage under the Policy pursuant to the Policy's terms.

35.     Defendant has knowingly engaged in unfair settlement practices in violation of Chapter 541 of the Texas Insurance Code.

36.     Defendant has specifically violated § 541.060 of the Texas Insurance Code by:

a.     Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear;

b.     Failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or offer of a compromise settlement of a claim;

c.     Refusing, failing, or unreasonably delaying a settlement offer under applicable first-party coverage; and

APP_007

         d.     Refusing to pay a claim without conducting a reasonable investigation with respect to the claim.

37.     To the extent that Defendant denied coverage on the basis that one or more terms of the Policy allegedly precluded coverage, Defendant is liable under Chapter 541.061 of the Insurance Code as well.

38.     Despite the fact that Defendant was aware of the underlying lawsuit, Defendant has failed to make a prompt, fair and equitable settlement offer on this claim even though liability is reasonably clear.

39.     Defendant's violations of this statute resulted in ActiTech incurring attorneys' fees and liability that had to be settled via a $2.75million payment to JRjr33.

40.     Under Chapter 541.152, Plaintiff is entitled to recover (A) damages equal to (i) $2.75 million for the amounts paid by ActiTech to settle this case, and (ii) the amounts paid by ActiTech for attorneys' fees for failure to tender a defense, and (B) attorneys' fees and costs for bringing this action.

41.     Defendant knowingly violated the statute and is thereby liable for treble damages and statutory penalties.

### THIRD CAUSE OF ACTION
#### COMMON LAW BAD FAITH

42.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

43.     Despite the fact that Defendant was aware of the underlying lawsuit, Defendant failed to make a prompt, fair and equitable settlement offer or to accept a reasonable settlement offer to resolve the underlying lawsuit, even though liability was reasonably clear.

44.     Defendant's failure to do so resulted in ActiTech incurring attorneys' fees and liability that had to be settled via a $2.75 million payment to JRjr33.

8

45.    Plaintiff is entitled to recover (A) damages equal to (i) $2.75 million for the amounts paid by ActiTech to settle this case and (ii) the amounts paid by ActiTech for attorneys' fees for failure to tender a defense, and (B) attorneys' fees and costs for bringing this action.

## FOURTH CAUSE OF ACTION
### TEXAS DECEPTIVE TRADE PRACTICES ACT

46.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

47.    Plaintiff's actions are actionable under the Texas Deceptive Trade Practices Act, Tex. Bus. Comm Code § 17.50(a)(4).

48.    Additionally, Plaintiff's actions violated the following provisions:

a.    Representing that … services have … benefits, … which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not (DTPA, Section 17.46(b)(5);

b.    Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law (DTPA, Section 17.46(b)(12);

c.    The failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed (DTPA, Section 17.46(b)(24).

ActiTech relied on one or more of these representations in the making and/or seeking of rights under the Policy.

49.    Defendant's actions as alleged herein were the producing cause of Plaintiff's damages.  Plaintiff is entitled to recover (A) damages equal to (i) $2.75 million for the amounts paid by ActiTech to settle this case and (ii) the amounts paid by ActiTech for attorneys' fees for failure to tender a defense, and (B) attorneys' fees and costs for bringing this action.

APP_009

## FIFTH CAUSE OF ACTION

### DECLARATORY JUDGMENT

50. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

51. Plaintiff seeks a declaration under the federal and state declaratory judgment statutes that the (i) the Policy is valid, (ii) that the Policy covered the usury claim, and (iii) that Defendant violated the Policy and state law by not providing coverage and attempting to settle the claim.

## IV.

## JURY DEMAND

52. Plaintiff demands a jury trial on all issues so triable.

## V.

## PRAYER

53. Plaintiff respectfully prays for judgment in his favor as Chapter 7 Trustee of JRjr33 and for an order that Defendant:

    a.    Pay damages in an amount to be found by the trier of fact, plus pre- and post-judgment interest;

    b.    Pay treble damages of an amount found to be damages by the trier of fact;

    c.    Pay attorneys' fees and costs as provided for as a matter of law or contract;

    d.    Pay such penalties as shall be applicable under the law;

    e.    Make such declarations and any other equitable remedy as may be justified or to which Plaintiff may show it is entitled.

APP_010

000045

Dated: October 22, 2023

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 2405809
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com

Kevin D. McCullough
State Bar No. 00788005
R**OCHELLE McCULLOUGH, LLP**
325 N. St. Paul Street, Suite 4500
Dallas, TX 75201
T: (214) 953-0182
F: (214-953-0185
E: kdm@romclaw.com

**COUNSEL FOR PLAINTIFF**

APP_011

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JRjr33, Inc., | § | **Case No. 18-32123-SGJ-7** |
| | § | |
| Debtor. | § | **Chapter 7** |
| _____ | § | |
| | § | |
| ROBERT YAQUINTO, In His Capacity as | § | |
| Chapter 7 Trustee of JRjr33, Inc. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 23-03086-SGJ** |
| | § | |
| CNA INSURANCE COMPANIES dba | § | |
| CONTINENTAL CASUALTY COMPANY, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S ORIGINAL ANSWER TO
PLAINTIFF'S ORIGINAL COMPLAINT**

Defendant Continental Casualty Company (referred to herein as "Defendant" or
"Continental"), incorrectly identified in the complaint as "CNA Insurance Companies dba
Continental Casualty Company," files this Original Answer to Plaintiff's Original Complaint (the
"Complaint").

Defendant responds to the allegations in the Complaint by correspondingly numbered
paragraphs as follows:

**I. PARTIES**

1.      Defendant admits the allegation in paragraph 1 of the Complaint that Robert
Yaquinto is the Chapter 7 Trustee of JRjr33, Inc. Defendant is without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in paragraph 1, so those allegations are denied.

2.      Defendant denies the allegations in paragraph 2 of the Complaint, except that Defendant admits its principal place of business is in Chicago, Illinois. Defendant states that its correct name is Continental Casualty Company, and that "CNA" is a service mark used by Continental and certain of its affiliates.

3.      Defendant admits the allegations in paragraph 3 of the Complaint that non-party ActiTech, LP ("Actitech") is the debtor in the Chapter 11 bankruptcy proceeding styled *In re Actitech, LP*, Case No. 22-30049-11, in the United States Bankruptcy Court for the Northern District of Texas, and that Actitech was an Insured on policy no. 425594086 (the "Policy"), which was issued to Actiprime Inc. as Named Insured.  Defendant denies that Actitech was a Named Insured, as defined by the Policy. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 3 of the Complaint, so those allegations are denied.

4.      Defendant admits the allegation in paragraph 4 of the Complaint that non-party Agel Enterprises, LLC was a plaintiff in the adversary lawsuit with Actitech styled *JRjr33 Inc. v. Michael Bishop, et al.*, Adversary No. 22-03002-sgj-11. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4 of the Complaint, so those allegations are denied.

## II.  VENUE AND JURISDICTION

5.      Defendant admits the allegations in paragraph 5 of the Complaint.

6.      Defendant admits the allegations in paragraph 6 of the Complaint.

APP_013

7.    Defendant admits the allegations in paragraph 7, except Defendant denies the allegation that it committed torts within the state.

### III.    FACTUAL BACKGROUND

8.    Defendant admits the allegations in paragraph 8 of the Complaint.

9.    Defendant admits the allegation in paragraph 9 of the Complaint that the underlying suit alleged, among other causes of action, that Actitech committed usury. To the extent that the remaining allegations are intended to reference the claims and allegations in the Original Petition filed in the underlying suit, that petition speaks for itself. To the extent that a response to such allegations is required, Defendant admits that the Original Petition alleged, among other things, that Actitech and Michael Bishop loaned money to Agel and that the interest terms exceeded the maximum amount of interest allowed under the Texas Finance Code. Any remaining allegations in paragraph 9 are denied.

10.    No response is necessary to the allegations in Paragraph 10 of the Complaint because they are legal conclusions concerning Texas usury law. To the extent a response is required, Defendant denies the allegations in Paragraph 10 of the Complaint.

11.    With respect to the allegations in paragraph 11 of the Complaint, Defendant admits that the Dallas district court signed a temporary injunction order granting Agel's application on October 26, 2021. With respect to the remaining allegations describing the terms of the order, the order speaks for itself. To the extent a response to such allegations is required, Defendant denies the allegations.

12.    Defendant admits the allegations in paragraph 12 of the Complaint.

13.    Defendant admits the allegations in paragraph 13 of the Complaint that Actitech removed the underlying suit to the bankruptcy court in the Actitech bankruptcy and that the

APP_014

000051

removed action became the adversary proceeding styled *JRjr33, Inc. and Agel Enterprises, Inc. v. Michael A. Bishop, et al.*, Adversary no. 22-30049-sgj-11. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 13 of the Complaint, so those allegations are denied.

14.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint, so those allegations are denied.

15.     Defendant denies the allegations in paragraph 15 of the Complaint, except Defendant admits that the scheduled limit of liability of the Policy's directors & officers liability coverage was $1,000,000, which amount is subject to a scheduled retention of $10,000 per claim, and is further subject to the erosion of such limits of liability based upon Defendant's payment of Loss in the form of defense costs and settlement payments.

16.     Defendant denies the allegations in paragraph 16 of the Complaint.

17.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint, so those allegations are denied.

18.     Defendant denies the allegations in paragraph 18 of the Complaint, except that Defendant admits that paragraph 18 accurately quotes the Policy's "deliberate acts" exclusion, which paragraph 18 refers to as the "intentional acts" exclusion.

19.     Defendant admits that paragraph 19 accurately quotes the referenced "illegal profits" exclusion in the Policy. The specific allegations that Agel made in its usury claim against Actitech are reflected in the petitions filed in the underlying suit, which petitions speaks for themselves. No response is necessary to the allegations concerning the Texas Finance Code because they are legal conclusions. Defendant denies the remaining allegations in paragraph 19 of the Complaint.

4

20.     Defendant denies the allegations in paragraph 20 of the Complaint.

21.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Complaint, so those allegations are denied.

22.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Complaint, so those allegations are denied. To the extent paragraph 22 is intended to allege that Defendant denied coverage or failed to offer to offer a defense to Actitech, Defendant denies those allegations.

23.     Defendant admits the allegations in paragraph 23 that a Motion for Approval of Compromise and Settlement of Claims of JRjr33, Inc. and Agel Enterprises, Inc. was filed by Actitech and that the Bankruptcy Court signed an order granting that motion on October 7, 2022. Defendant denies the remaining allegations in paragraph 23 of the Complaint.

24.     No response is necessary to the allegations in paragraph 24 of the Complaint. To the extent that a response is required, Defendant admits that JRjr33 asserts that it is pursuing claims as an assignee but denies that such assignment is valid.

## II. (sic)  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT AND/OR
### IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

25.     No response is necessary to the allegations in paragraph 25 of the Complaint, which merely incorporates Plaintiff's previous allegations. To the extent a response is necessary, Defendant incorporates its responses to the previous paragraphs.

26.     Defendant admits the allegations in paragraph 26 of the Complaint.

27.     Defendant denies the allegations in paragraph 27 of the Complaint.

28.     Defendant denies the allegations in paragraph 28 of the Complaint.

29.     Defendant denies the allegations in paragraph 29 of the Complaint.

5

30.     Defendant denies the allegations in paragraph 30 of the Complaint.

31.     Defendant denies the allegations in paragraph 31 of the Complaint.

32.     Defendant denies the allegations in paragraph 32 of the Complaint.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF CHAPTER 541 OF TEXAS INSURANCE CODE**

33.     No response is necessary to the allegations in paragraph 33 of the Complaint, which merely incorporates Plaintiff's previous allegations. To the extent a response is necessary, Defendant incorporates its responses to the previous paragraphs.

34.     Defendant admits the allegations in paragraph 34 of the Complaint that notice of the underlying suit against Michael Bishop and Actitech was provided on behalf of Actitech to Defendant. Defendant denies any remaining allegations in paragraph 34 of the Complaint.

35.     Defendant denies the allegations in paragraph 35 of the Complaint.

36.     Defendant denies the allegations in paragraph 36 of the Complaint.

37.     Defendant denies the allegations in paragraph 37 of the Complaint.

38.     Defendant denies the allegations in paragraph 38 of the Complaint, except that Defendant admits it was aware of the underlying lawsuit. To the extent that paragraph 38 implies that Defendant had a duty to make settlement offers, Defendant specifically denies that it had any such duty.

39.     Defendant denies the allegations in paragraph 39 of the Complaint.

40.     Defendant denies the allegations in paragraph 40 of the Complaint.

41.     Defendant denies the allegations in paragraph 41 of the Complaint.

APP_017

000054

### THIRD CAUSE OF ACTION
### COMMON LAW BAD FAITH

42.     No response is necessary to the allegations in paragraph 42 of the Complaint, which merely incorporates Plaintiff's previous allegations. To the extent a response is necessary, Defendant incorporates its responses to the previous paragraphs.

43.     Defendant denies the allegations in paragraph 43 of the Complaint.

44.     Defendant denies the allegations in paragraph 44 of the Complaint.

45.     Defendant denies the allegations in paragraph 45 of the Complaint.

### FOURTH CAUSE OF ACTION
### TEXAS DECEPTIVE TRADE PRACTICES ACT

46.     No response is necessary to the allegations in paragraph 46 of the Complaint, which merely incorporates Plaintiff's previous allegations. To the extent a response is necessary, Defendant incorporates its responses to the previous paragraphs.

47.     Defendant denies the allegations in paragraph 47 of the Complaint.

48.     Defendant denies the allegations in paragraph 48 of the Complaint.

49.     Defendant denies the allegations in paragraph 49 of the Complaint.

### FIFTH CAUSE OF ACTION
### DECLARATORY JUDGMENT

50.     No response is necessary to the allegations in paragraph 50 of the Complaint, which merely incorporates Plaintiff's previous allegations. To the extent a response is necessary, Defendant incorporates its responses to the previous paragraphs.

51.     No response is necessary to the allegations in paragraph 51 of the Complaint because they merely assert that Plaintiff seeks certain declarations. To the extent a response is necessary, Defendant admits that Plaintiff seeks declaratory relief, but denies that Plaintiff is entitled to any such relief.

APP_018

## IV.    JURY DEMAND

52.    No response is necessary to the allegations in paragraph 52 of the Complaint, which merely asserts that Plaintiff demands a jury trial. To the extent a response is necessary, Defendant admits that Plaintiff has requested a jury trial but denies that Plaintiff is entitled to a verdict in its favor.

## V.    PRAYER

53.    No response is necessary to the allegations in paragraph 53 of the Complaint, which merely prays for judgment and an order granting certain remedies. To the extent a response is necessary, Defendant denies the allegations in paragraph 53 of the Complaint and denies that Plaintiff is entitled to any such relief.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

For further answer, without assuming any additional burden or any burden not placed upon Defendant by the law applicable to this case, Defendant asserts that the following defenses, either singly or in combination, bar Plaintiff's claims and/or right to recover, in whole or in part, the damages and relief alleged.

1.    Plaintiff claims are barred or limited, in whole or in part, because the claims asserted by Plaintiff in the underlying suit are not covered by the terms and conditions of the Policy.

2.    Plaintiff's claims are barred or limited, in whole or in part, because exclusion 5, "Illegal Profits/Deliberate Acts," precludes coverage for the claims asserted by Plaintiff in the underlying suit. That exclusion states that the Insurer shall not be liable to pay any Loss under that Coverage Part in connection with any Claim made against any Insured where:

      a.    such Insureds in fact gained any profit, remuneration or pecuniary advantage to which they were not legally entitled; or

    b.  such Insureds committed any fraudulent or criminal Wrongful Act with actual knowledge of its wrongful nature or with intent to cause damage,

as evidenced by a final adjudication by a judge, jury, or arbitrator in any proceeding;

For purposes of determining the applicability of this exclusion:

    1.  the facts pertaining to and knowledge possessed by any Insured Person shall not be imputed to any other Insured Person; and

    2.  only facts pertaining to and knowledge possessed by any past, present or future Chief Executive Officer, Chairperson, Chief Financial Officer, President (or any equivalent position) of an Insured Entity shall be imputed to all Insured Entities;

3.    Plaintiff's claims are barred or limited, in whole or in part, because the claims, damages, and remedies alleged in the underlying suit, and the amounts paid in settlement of such suit, do not fall within the Policy's Definition of "Loss." With respect to the Policy's Directors & Officers Liability Coverage Part, the Policy's definition of "Loss" states, in pertinent part, that it does not include:

    1.  civil or criminal fines, penalties, taxes, sanctions or forfeitures imposed on an Insured whether pursuant to law, statute, regulation or court rule, other than those civil fines or penalties imposed under 42 USC 1320d-5(a) of the Health Insurance Portability and Accountability Act of 1996, provided however that the maximum limit of the Insurer's liability for all such fines and penalties shall be $100,000 per Claim. This sublimit of Liability is part of and not in addition to the applicable Limits of Liability;

    2.  any amount (other than Defense Costs) attributable to the cost of any non-monetary relief, including without limitation any costs associated with compliance with any injunctive relief of any kind or nature;

    3.  any amounts for which an Insured is liable due to an act or omission in knowing violation of any written contract or agreement or due to its assumption of the liability of others under any contract or agreement;

4.    Plaintiff's claims are barred or limited, in whole or in part, because the settlement between Plaintiff and Actitech constituted a violation of Paragraph XXI of the Policy, "Defense/Settlement/ Mediation/Pre-Claim Assistance," subparagraph B(3), which states: "The

9

**Insureds** shall not admit liability, consent to any judgment, agree to any settlement or make any settlement offer without the Insurer's prior written consent, such consent not to be unreasonably withheld.  The Insurer shall not be liable for any **Loss** to which it has not consented. The **Insureds** agree that they shall not knowingly take any action which increases the Insurer's exposure for **Loss** under this Policy."

5.     Plaintiff's claims are barred or limited, in whole or in part, because the purported assignment to Plaintiff of Actitech's rights and claims against Defendant constitutes a violation of Paragraph VII of the Policy, "Assignment of Interest," which states "[a]ssignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed to this Policy."

6.     Plaintiff's claims are barred or limited, in whole or in part, because the settlement and purported assignment to Plaintiff of Actitech's rights and claims against Defendant violates public policy and are therefore unenforceable and not binding against Defendant.

7.     Plaintiff's claims are barred or limited, in whole or in part, because of the Insureds' violation of the cooperation and assistance obligation specified in Paragraph XXI., "Defense/Settlement/Mediation/Pre-Claim Assistance," subparagraph B(5), "Cooperation/Assistance of **Insureds**," which states that "[t]he **Insureds** shall furnish the Insurer with copies of reports, investigations, pleadings, and all related papers, and such other information, assistance and cooperation as the Insurer may reasonably request.

8.     Plaintiff's claims are barred or limited, in whole or in part, to the extent that Plaintiff seeks recovery for any amounts allocable to claims, causes of action, or damages that are not covered by the Policy. Plaintiff has the burden to produce sufficient information to segregate and allocate the amounts it seeks between covered and uncovered amounts.

APP_021

000058

9.    Plaintiff's claims are barred or limited, in whole or in part, because Defendant had, at the very least, a reasonable basis for its coverage position and there was at a minimum a bona fide dispute as to some or all of the issues and claims alleged by Plaintiff.

10.    Plaintiff's claims are barred or limited, in whole or in part, because Defendant had no duty under the Policy to indemnify Actitech for the claims asserted by Plaintiff in the underlying lawsuit or for any settlement between Actitech and Plaintiff. Because all of Plaintiff's claims are premised on the existence of a duty to indemnify, all of those claims fail.

11.    Plaintiff's claims are barred or limited, in whole or in part, because Plaintiff lacks standing to assert claims against Defendant.

12.    Plaintiff's claims for common law bad faith and for breach of an implied duty of good faith and fair dealing are barred or limited, in whole or in part, because Texas law does not recognize any such duty in the context of an insurer's handling of a third-party claim against its insured. *Maryland Ins. Co. v. Head Indus. Coatings & Servs., Inc.*, 938 S.W.2d 27, 28 (Tex. 1996); *Mid-Continent Cas. Co. v. Eland Energy, Inc.*, 795 F. Supp. 2d 493, 507-08 (N.D. Tex. 2011), *aff'd*, 709 F.3d 515 (5th Cir. 2013).

13.    Plaintiff's claims under the Texas Deceptive Trade Practices Act, Tex. Bus. & Comm. Code § 17.50 are barred or limited, in whole or in part, because Plaintiff alleges misrepresentations and/or failure to disclose information relating to coverage for the claims in the underlying suit, which are not actionable under the statute and are in effect a mere restatement of Plaintiff's claim for breach of contract.

14.    Plaintiff's claims for declaratory judgment are barred or limited, in whole or in part, because they are duplicative of Plaintiff's claims for breach of contract. *Vandelay Hosp. Grp. LP v. Cincinnati Ins. Co.*, No. 3:20-CV-1348-D, 2020 WL 4784717, at *7 (N.D. Tex. Aug. 18, 2020); *Atlas Trading Conglomerate Inc. v. AT&T Inc.*, No. 3:15-CV-0404-K, 2016 WL

11

5870857, at *6 (N.D. Tex. Oct. 5, 2016), *aff'd*, 714 Fed. App'x. 318 (5th Cir. 2017); *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 624 (Tex. 2011).

15.     To the extent Defendant has any liability, which is denied, Defendant is liable only up to the applicable limit of liability. The Policy's scheduled limit of liability is $1,000,000, which limit has been eroded by Defendant's payment of Loss.

16.     To the extent Defendant has any liability, which is denied, Defendant is liable only for that Loss that exceeds the scheduled retention, which is $10,000 per claim.

17.     Defendant affirmatively pleads all statutory caps and restrictions on punitive/exemplary damages, including but not limited to Texas Civil Practice and Remedies Code §§ 41.003, 41.004, 41.006, 41.007, and 41.008.

18.     Defendant affirmatively plead that an award of punitive or exemplary damages in this case will contravene and violate the Excessive Fines Clause of the Eighth Amendment of the United States Constitution; Section 1 of the Fourteenth Amendment of the United States Constitution, which guarantees due process of law and equal protection of the laws; Article 1, Section 3 of the Texas Constitution, which guarantees equal protection of the law; and Article 1, Section 10 of the Texas Constitution, which guarantees due process.

19.     Defendant reserves the right to amend or supplement this filing, and to assert other and further defenses, affirmative defenses, counterclaims, cross-claims, and/or third-party claims as may be warranted.

APP_023

000060

Respectfully submitted,


 */s/ David H. Timmins*
David H. Timmins
Texas Bar No. 00785106
david.timmins@huschblackwell.com
Buffey E. Klein
Texas Bar No. 24032515
buffey.klein@huschblackwell.com
HUSCH BLACKWELL LLP
1900 North Pearl, Suite 1800
Dallas, Texas 75201
Telephone: (214) 999-6100
Facsimile: (214) 999-6170

**ATTORNEYS FOR DEFENDANT
CONTINENTAL CASUALTY COMPANY**

APP_024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing was delivered to counsel of record via this Court's CM/ECF notification system to the parties below on this 29th day of December 2023:

/s/*Buffey E. Klein*                    
Buffey E. Klein

**Robert Yaquinto**
*Added: 10/22/2023*
*(Plaintiff)*

represented by

**Kevin Dale McCullough**
Rochelle McCullough, LLP
901 Main St
Suite 3200
Dallas, TX 75202
214-953-0182
kdm@romclaw.com
*Assigned: 10/30/23*

**Mazin Ahmad Sbaiti**
Sbaiti & Company PLLC
JP Morgan Chase Tower
2200 Ross Avenue, Suite 4900 W
Dallas, TX 75201
(214) 432-2899
(214) 853-4367 (fax)
mas@sbaitilaw.com
*Assigned: 10/22/23*
*LEAD ATTORNEY*

**Shannon Smith Thomas**
Rochelle McCullough, LLP
901 Main St
Suite 3200
Dallas, TX 75202
214-580-2504
214-953-0185 (fax)
sthomas@romclaw.com
*Assigned: 12/29/23*

**Error! Unknown document property name.**

000062



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 24, 2024**

_____
**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JRjr33, Inc. | § | Case No. 18-32123-SGJ-7 |
| | § | |
| Debtor. | § | Chapter 7 |
| | § | |

| | | |
|---|---|---|
| ROBERT YAQUINTO, In His Capacity as | § | |
| Chapter 7 Trustee of Jrjr33, Inc. | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 23-03086-SGJ |
| | § | |
| CNA INSURANCE COMPANIES dba | § | |
| CONTINENTAL CASUALTY COMPANY | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER GRANTING RULE 12(c) MOTION

1

APP_026

## I.     INTRODUCTION

Before this court is an insurance coverage dispute.  The dispute found its way to the bankruptcy court in a convoluted manner.  There are two different debtors, in separate cases before the same bankruptcy judge, and each debtor has a connection to this coverage dispute.

The JR Debtor.  One debtor is JRjr33, Inc. ("JR"), Case No. 18-32123, which is in a long-running Chapter 7 case.  JR's case was originally filed as a Chapter 11 case and was converted to a Chapter 7 case a few months later.  Its trustee is Robert Yaquinto, who is the plaintiff herein ("Plaintiff").   JR owned numerous subsidiaries that sold home goods and personal products, apparently mostly in a multi-level marketing structure, including (i) one called The Longaberger Company (which sold iconic, wooden picnic baskets, and also filed bankruptcy along with JR), and (ii) another called Agel Enterprises, Inc. ("Agel"), which sold nutritional supplements and skin care products (and did not file bankruptcy).

The ActiTech Debtor.  The other debtor is ActiTech, L.P. ("ActiTech"), Case No. 22-30049.  ActiTech was a manufacturer of nutraceuticals and skin care products with a large manufacturing facility north of Dallas.  ActiTech's case was filed as a Chapter 11 a few years after the JR case, and it confirmed a plan on October 5, 2022.  Thus, it is now a reorganized debtor.

The Usury Suit.  How are JR and ActiTech intertwined?  They and certain of their affiliates did business together in the days before they each filed bankruptcy.[1]  ActiTech, as a manufacturer, was a supplier of product to Agel.  ActiTech extended credit terms (i.e., a floating line of credit

---

[1] A pleading filed in the JR case, of which this court takes judicial notice, indicates that an individual named Michael Bishop was a board member of JR and was also an insider and/or owner of ActiTech at the time of the events that are at issue in this coverage dispute. Case # 18-32123, DE # 258, ¶ 12.  The court takes judicial notice that Michael Bishop's ex-wife, Ellysiann Bishop, was president of ActiTech at the time of its bankruptcy filing and throughout its Chapter 11 case.

2

APP_027

with a complex formula) to Agel for the purchase of product. Eventually the two got crossways, with Agel accusing ActiTech of charging it usurious interest (allegedly in excess of 28%, in violation of the Texas usury statute). Tex. Fin. Code Section 305.003. A lawsuit was filed on November 3, 2017, against ActiTech and its affiliates, styled *JRjr33, Inc. and Agel Enterprises, Inc. v. Michael Bishop et al.,* Cause No. DC-17-15206, in the 116th Judicial District Court of Dallas County, Texas (the "Usury Suit"). Therein, Agel sought an approximately $11 million **statutory civil penalty** from ActiTech and its affiliates for three times the amount of the allegedly usurious interest **charged**. Agel did not seek monetary damages for the alleged usury beyond the penalty. To be clear, Agel did not allege that ActiTech had actually **received** the unlawful interest, but that ActiTech was nevertheless liable because Texas Finance Code § 305.001(a-1) imposes usury liability on anyone who "contracts for or receives" interest greater than the amount authorized.

Meanwhile, during the pendency of this state court Usury Suit, each JR and ActiTech filed their respective bankruptcy cases. First, JR did in year 2018. Shortly thereafter, Plaintiff (who held ownership and control of Agel) was granted standing on behalf of Agel to pursue the Usury Suit. Then, ActiTech filed its Chapter 11 in 2022, and removed the Usury Suit to the bankruptcy court, Adv. Proc. # 22-3002. The court notes anecdotally that ActiTech filed a proof of claim in the JR case and Agel filed a proof of claim in the ActiTech case.[2]

The Usury Settlement. Eventually, on July 20, 2022, Agel (through Plaintiff) and ActiTech reached a settlement (after multiple attempts at mediation) pursuant to which ActiTech agreed to pay JR and Agel $2,750,000 in damages and **also assigned to JR all rights, interest, and claims it**

---

[2] On October 22, 2018, ActiTech filed Proof of Claim No. 30 in the JR bankruptcy case, asserting a claim of $1,767,359.93 for amounts purportedly owed for products manufactured. On March 21, 2022, Agel filed Proof of Claim No. 16 in the ActiTech bankruptcy, asserting a claim of $16,279,744.42 relating to the alleged usury, plus prejudgment interest and attorneys' fees on its usury claim.

APP_028

*might have against ActiTech's insurer* under a directors and officers liability policy on which ActiTech was an insured (the "Usury Settlement"). The bankruptcy court approved the Usury Settlement in both the JR and ActiTech bankruptcy cases in October 2022. Case # 18-32123, DE #262 (entered 10/12/22). Case # 22-30049, DE #127 (entered 10/7/22; considered at the same time as plan confirmation).[3]

The Now-Pending Coverage Dispute. This brings us to the current Adversary Proceeding, filed October 22, 2023. Plaintiff brought this action as assignee of ActiTech, subsequent to the Usury Settlement. The defendant named herein is CNA Insurance Companies dba Continental Casualty Company ("Continental"). Continental provided the directors and officers liability insurance policy to ActiTech, under policy no. 425594086 (the "Policy"), issued to Actiprime, Inc. ("Actiprime")[4] for the period July 24, 2017 to July 24, 2018. See Compl. ¶3; Policy, Ex. A. The Policy provides directors and officers liability coverage with a $1 million aggregate limit of liability. See Policy, Ex. A.

Plaintiff has alleged in this Adversary Proceeding that Continental breached the Policy by not paying for a covered loss (Compl. ¶28); breached an "implied covenant of good faith and fair dealing" by failing to accept a settlement demand or make a reasonable settlement offer, and by denying coverage and/or not tendering a full defense (Compl. ¶29); violated the Texas Insurance Code by engaging in certain unfair settlement practices (Compl. ¶¶35-36); engaged in common law bad faith by failing to make or accept a settlement offer (Compl. ¶43); and violated the Texas

---

[3] The court is not aware whether the insurer, Continental, was provided notice of the Usury Settlement in either the JR case or the ActiTech case. Moreover, the Policy does not appear to be in the record from the hearings on the Usury Settlement. The court merely points this out to rule out any specter of estoppel being applicable here (the court has not previously ruled on the issue of whether assignment of the Policy was legally permissible).

[4] Actiprime was apparently an affiliate of ActiTech but, in any event, there is no dispute that ActiTech was an insured under the Policy. The court notes that ActiTech is named on the "Additional Insured Endorsement" attached to a copy of the Policy submitted to the court.

4

Deceptive Trade Practices Act by making unspecified misrepresentations and failing to disclose unspecified information (Compl. ¶48). Plaintiff also seeks declaratory relief that the Policy is valid, that the Policy covered the usury claim, and that Continental violated the Policy and state law by not providing coverage and attempting to settle the claim.  According to Plaintiff, sometime in the middle of year 2021, a "Stowers demand" was sent to Continental, offering to settle within the existing Policy limits, but Continental did not respond.

While this Adversary Proceeding was originally pleaded more broadly, it appears that Plaintiff has now narrowed its arguments to these:  Continental is liable for breach of contract for failure to cover the usury claim as a covered "Loss," and Plaintiff also has a Stowers claim against Continental related thereto. Plaintiff alleges that it is entitled to recover the $2.75 million paid by ActiTech to settle the claim and the attorneys' fees paid by ActiTech for its defense. See Compl. ¶¶31 40, 45, 49.[5]

In a Rule 12(c) Motion of Continental that is now before the court, Continental argues that Plaintiffs' claims in this Adversary Proceeding fail as a matter of law because the Policy does not provide coverage for a ***civil penalty*** claim, such as was asserted against ActiTech pursuant to the Texas usury statute.  Specifically, civil penalty claims are excluded from the Policy's definition of "Loss."  Thus, the Policy was inapplicable, and Continental had no duty to defend or indemnify ActiTech.   Continental further argues that, because all of Plaintiff's claims in the Adversary Proceeding are premised upon the existence of coverage for the underlying usury claim, they must all be dismissed. Further to that point, Continental adds that Plaintiff's alternative request (in his Response to the Rule 12(c) Motion) to amend his complaint to assert or clarify a "Stowers claim"

---

[5] To be clear, Plaintiff has now agreed that his claims for violation of DTPA and the Texas Insurance Code, his claim for declaratory relief, and his claims for breach of a common law implied covenant of good faith and fair dealing should be dismissed.

should be denied as futile (the Stowers doctrine requires a covered claim to begin with, so the proposed claim would not survive the lack of a covered "Loss"). Finally, Continental argues that the Policy's "Anti-Assignment provision" prohibited an assignment of rights under the terms of the Policy without Continental's written consent (adding that the Policy, whose coverage period had expired prepetition, was not an executory contract, under section 365, that might have been assumed and assigned by the debtor ActiTech).

This court agrees with Continental on all points. The court's reasoning is more fully set forth below. The Rule 12(c) Motion will be granted.

## II.    LEGAL STANDARD

When reviewing a motion for judgment on the pleadings, the court may only consider the pleadings, documents incorporated into the pleadings by reference and matters of which the court may take judicial notice. *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.,* 976 F.3d 585 (5th Cir. 2020). The standard for Rule 12(c) motions for judgment on the pleadings is identical to the standard for Rule 12(b)(6) motions to dismiss for failure to state a claim. *Waller v. Hanlon,* 922 F.3d 590, 599 (5th Cir. 2019). In evaluating a motion to dismiss under Rule 12(b)(6), a complaint is to be charitably construed, with all well pleaded factual allegations being accepted as true, and with any reasonable inferences from those facts being drawn in favor of the non-moving party. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–556 & 569 n. 14 (2007). Moreover, "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555–556.

In 2009, the Supreme Court clarified the *Twombly* pleading standard and elaborated that, to survive a motion to dismiss, a civil complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129

APP_031

S.Ct. 1937, 173 L. Ed. 2d 868 (2009) (the Court also affirmed the *Twombly* two-pronged approach to deciding motions to dismiss: first, determine what is a factual allegation versus a legal conclusion, as only factual allegations will be accepted as true; and second, determine whether the factual allegations state a plausible claim for relief).

### III.    ANALYSIS

Analysis of the Rule 12(c) Motion essentially boils down to the following two issues: (a) first, whether the Policy excluded civil penalty claims from its definition of "Loss"; (b) second, assuming that civil penalty claims did constitute a covered "Loss," whether the Policy was an executory contract that could be assumed and assigned, without the written consent of Continental pursuant to section 365 of the Bankruptcy Code ("the Code"), despite the Policy's "Anti-Assignment provision".

The court concludes that the Policy excludes civil penalty claims, such as the one asserted in the Usury Suit, from its definition of "Loss"; therefore, the Policy did not apply to the claim in the underlying Usury Suit, and Continental had no duty to defend or indemnify ActiTech. The court further concludes that, even if the claim was covered as a "Loss," the Policy was not an executory contract of ActiTech that could have been assumed and assigned, pursuant section 365(f), notwithstanding the Policy's "Anti-Assignment provision".

### *A. Loss*

First, the court concludes that the civil penalty claim in the Usury Suit is not a covered loss under the Policy, because the Policy's definition of "Loss" explicitly excludes civil penalties. The Policy defines "Loss" as including "punitive and exemplary damages." See Policy, Ex. A. However, the Policy explicitly states that "Loss" does not include "***civil or criminal fines, penalties, taxes, sanctions, or forfeitures imposed on an Insured whether pursuant to law,***

7

*statute, regulation, or court rule*…" *Id.* (Emphasis added.)  As a reminder, the Usury Suit sought only a statutory civil penalty from ActiTech and its affiliates for three times the amount of the allegedly usurious interest charged.  It did not seek monetary damages for the alleged usury beyond the penalty. This is a permissible way to proceed under the Texas Finance Code § 305.001(a-1).

The Plaintiff directs the court to the Fifth Circuit's decision in *Flagship Credit Corp. v. Indian Harbor Insurance Co.*, 481 F. App'x 907 (5th Cir. 2012).[6] to defend its position. Plaintiff argues that *Flagship* concerned an insurance policy with identical language, and there the Fifth Circuit held that the "penalties" excluded by the loss provision included only penalties payable to the government.

The insurance policy in *Flagship* was, in fact, not identical to the Policy here.  It was merely similar.  It stated that "loss [would] not include… fines, penalties, or taxes imposed by law." *Id.* at 909.  The Fifth Circuit determined that canons of construction must be applied to the word "penalties" before any other analysis, because the term was ambiguous. *Id.* at 911. The court applied the *noscitur a scoiis* canon of construction[7] to determine the meaning of the word "penalties". The court determined that fines and taxes described payments that could only be made to the government. Therefore, within the limited context of the insurance policy there, the court held that the meaning of penalties meant only penalties payable to the government—as "penalties" needed to fit with the meaning of the other words in the group. *Id.*

The court is not persuaded that *Flagship* is dispositive because, as noted, the language at issue there differed from the Policy's language here in two critical ways. First, the Policy here, unlike

---

[6] The court in *Flagship* stated that "Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4." However, this court will address the case as the parties referenced it heavily.

[7] Stating that a word may be known by the company it keeps. *Russell Motor Car Co. v. United States,* 261 U.S. 514, 519, 43 S. Ct. 428, 67 L. Ed 778 (1923)

APP_033

in *Flagship*, includes a "civil or criminal" preamble that operates to expand the concept of penalties. See Policy, Ex. A, p. CAN-000048. Second, the Policy states that a Loss does not include "fines, penalties, taxes, sanctions or forfeitures," while the Flagship policy did not include "sanctions" or "forfeitures" in its list of exclusions. *Id.; Flagship,* 481 F. App'x at 909.

Here, because the meaning of the word penalty in the loss exclusion clause is not ambiguous, the court does not need to apply canons of construction. The Policy explicitly states that the definition of "Loss" does not include "***civil*** or criminal…penalties" (emphasis added) while the *Flagship* policy merely excluded 'penalties' without reference to whether the penalties were ***civil*** or criminal. Here, the "civil or criminal" preamble serves to clarify the intended extent of the enumerated items. It would be an absurd result to find that the definition of "Loss" in the Policy included a claim for a civil penalty that might be imposed in favor of a private party, when the plain language explicitly excludes it. Moreover, the court is unconvinced by the Plaintiff's argument that the relief sought in the Usury Suit was not a civil penalty, when the Plaintiff explicitly sought "civil penalties" in its original claim. See Ninth Am. Pet., Ex. B.

Even if the meaning of the word penalty here was ambiguous, applying the *noscitur a sociis* canon would not lead to the same conclusion that the *Flagship* court reached. To construe a word within the meaning of a larger group, there must be a majority that governs. In *Flagship*, the court determined that two of the three words (fines and taxes) were payable only to the government, so it followed that penalties would have the same meaning. Here, only two of the five words are exclusively payable to the government. Again, the Policy excludes from "Loss": "fines, penalties, taxes, sanctions and forfeitures." See Policy, Ex. A, p. CAN-000048. While fines and taxes may be payable only to the government, sanctions and forfeitures can be paid to private individuals. No

majority exists to govern the meaning of all terms, so applying the *noscitur a sociis* canon of construction here does not result in finding that penalties are only payable to the government.

For the foregoing reasons, the Policy does not cover the Usury Suit because the Policy explicitly excluded civil penalties from the definition of "Loss".

### B. The Policy is Not an Executory Contract

ActiTech assigned to JR "any and all causes of action [ActiTech] might have against [Continental]…" in the Usury Settlement. Final Settlement Agreement and Mutual Release at 6-7. First and foremost, no cause of action against Continental exists because the underlying civil penalties claim in the Usury Suit was not a covered loss.

However, even if the Policy covered the claimed loss, the Policy and rights therein were not assignable without Continental's written consent, pursuant to the terms of the Policy. Moreover, the Policy was not an executory contract.  Thus, section 365(f)—which sometimes operates to over-ride an anti-assignment clause in an executory contract—does not apply.

The Policy's "Anti-Assignment provision" states that "Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereto this Policy," and here, Continental did not consent by an endorsement. See Policy, Ex. A, p. CNA-000035. Courts will generally uphold anti-assignment provisions so long as they do not interfere with the operation of a statute. *Nautilus Ins. Co. v. Concierge Care Nursing Centers, Inc.,* 804 F. Supp. 2d 557, 560 (S.D. Tex. 2011).

Here, the relevant statute is argued to be section 365 of the Code, governing executory contracts. The Code permits a trustee to assign an executory contract of a debtor to a third party even if the contract features an anti-assignment provision. *See* 11 U.S.C. § 365(f); *Matter of Provider Meds, LLC*, 907 F.3d 845, 851 (5th Cir. 2018). While Congress has not defined the phrase

10

executory contract, courts generally employ the so-called Countryman definition of executory contracts, which states that a contract is executory when the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure to complete performance would be a material breach excusing performance of the other. *In re Placid Oil Co.,* 72 B.R. 135, 137 (Bankr. N.D. Tex. 1987). Here, the Plaintiff argues that the contract was executory at the time of the filing of the ActiTech bankruptcy case (in 2022), even though the coverage period (July 2017-July 2018) had ended, because both parties still had material obligations left to fulfill.  The court finds this argument unpersuasive.

Plaintiff cites *Charter School Solutions v. GuideOne Mutual Insurance Company* 407 F. Supp 3d 641 (W.D. Tex. 2019), to support the proposition that an insurance contract whose coverage period has ended can still be executory. The court in *Charter Schools* stated that a material obligation on the part of an insured could include such things as compliance with a prompt notice provision or co-operation clause. *Id.* at 648.  However, the *Charter Schools* decision goes against the majority of the case law. This court does not find the reasoning persuasive. The court in *Charter Schools* acknowledges that courts are split regarding whether an expired or terminated insurance policy is executory.

The court in *Charter Schools* cites to two cases to support the proposition that some courts recognize expired insurance contracts as executory, both of which are distinguishable from this case. In one of these cases, *In re Fort Worth Osteopathic Hospital Inc.,* 387 B.R. 706, 714 n.14 (Bankr. N.D. Tex. 2008), the court discussed the issue only in a footnote, and there stated that there are arguments on either side of the issue but ultimately declined to rule either way. In the other case, *In re Texscan Corp.,* 976 F.2d 1269, 1273 (9th Cir. 1992), the insured was still obligated to pay for the final five weeks of coverage under the insurance contract, and the policy was still

11

active at the time the debtor filed its petition. This case is distinguishable from the one at hand as here, the insurance policy period was no longer ongoing when the debtor filed its petition, and the debtor had made all of its premium payments.

The majority of courts have found that no material obligation remains if the insured has paid all premiums, and the policy period is no longer in effect because the contract was terminated or expired. *In re Fed.-Mogul Glob. Inc*., 385 B.R. 560 (Bankr. D. Del. 2008); *In re Placid Oil Co.,* 72 B.R. 135, 137 (Bankr. N.D. Tex. 1987); *In re Fed. Press Co. Inc.*, 104 B. R. 56, 66 (Bankr. N.D. Ind. 1989).  In *In re Federal Press Company Inc.,* the court stated the insurance contract at issue had expired and was not executory. *Id.* at 66. There, the court concluded that the executory contract period ended when the last effective date for the policy passed. *Id.*

Here, the Policy period expired July 24, 2018, over three years before ActiTech filed bankruptcy. When ActiTech assigned its claim to Plaintiff, the policy period had been expired for almost four years.  The contract was not executory because the effective period of the Policy had expired, and the premiums were already paid.  Therefore, no material obligation remained on the part of ActiTech or other insureds. The lingering duty of the Plaintiff to provide notice to the insurer and co-operate is an obligation, the breach of which may lead to damages, but it is not a ***material*** obligation that would lead to a finding that the contract is executory.

APP_037

IV.    <u>Conclusion</u>

Accordingly, for the reasons set forth above, the Rule 12(c) Motion is granted as the Plaintiff has failed to state a claim upon which relief can be granted in this Adversary Proceeding. The underlying civil penalty claim asserted in the Usury Suit was not a covered Loss pursuant to the Policy. Even if the claim had been a covered Loss, the Policy and rights therein were unassignable, absent Continental's written consent, and Continental did not provide written consent to assignment of the Policy and rights thereunder to the Plaintiff.  Finally, the Policy was not an executory contract under section 365 of the Code, that might have been assumed and assigned by the insured to the Plaintiff absent Continental's consent, pursuant to section 365(f).

Based on the foregoing,

**IT IS ORDERED** that the Motion of Defendant for Judgment on the Pleadings is **GRANTED.** Continental shall submit a Judgment consistent herewith.

### ###END OF MEMORANDUM OPINION AND ORDER###

APP_038



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed November 14, 2024

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 18-32123-SGJ-7** |
| **JRjr33, Inc.** | § | |
| | § | **Chapter 7** |
| Debtors. | § | |

_____

| | | |
|---|---|---|
| **ROBERT YAQUINTO, In His Capacity** | § | |
| **as Chapter 7 Trustee of Jrjr33, Inc.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Adversary No. 23-03086-SGJ** |
| | § | |
| **CNA INSURANCE COMPANIES** | § | |
| **dba CONTINENTAL CASUALTY** | § | |
| **COMPANY** | § | |
| | § | |
| Defendant. | § | |

## <u>FINAL JUDGMENT</u>

On October 24, 2024, the Court entered its Memorandum Opinion and Order Granting Rule

12(c) Motion [Docket No. 39] (the "**Opinion**"), which granted Defendant Continental Casualty

APP_039

000305

Company's Rule 12(c) Motion for Judgment on the Pleadings [Docket No. 18] seeking dismissal of all claims asserted by Robert Yaquinto, in his capacity as Chapter 7 Trustee of JRjr33, Inc.  As the Opinion disposes of all claims and causes of action, the Court renders the following Final Judgment pursuant to Federal Rule of Bankruptcy Procedure 7058 and Federal Rule of Civil Procedure 58.

It is therefore **ORDERED** that all of Plaintiff's claims against Defendant are **DISMISSED WITH PREJUDICE**, including:

1. First Cause of Action: Breach of Contract and/or Implied Covenant of Good Faith and Fair Dealing;

2. Second Cause of Action: Violations of Chapter 541 of Texas Insurance Code;

3. Third Cause of Action: Common Law Bad Faith;

4. Fourth Cause of Action: Texas Deceptive Trade Practices Act; and

5. Fifth Cause of Action: Declaratory Judgment.

It is further **ORDERED** that all relief not expressly granted is **DENIED**.

### ### END OF ORDER ###

Prepared by:

*/s/ David H. Timmins*
David H. Timmins
Texas Bar No. 00785106
dtimmins@spencerfane.com
Megan Clontz
Texas Bar No. 24069703
mclontz@spencerfane.com
**SPENCER FANE LLP**
2200 Ross Avenue, Suite 4800 West
Dallas, Texas 75201
Telephone: (469) 391-7704
Facsimile: (214) 750-3612

**ATTORNEY FOR DEFENDANT**
**CONTINENTAL CASUALTY COMPANY**

APP_040

Mazin A. Sbaiti
Texas Bar No. 24058096
SBAITI & COMPANY PLLC
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 214-3400
F: (214) 853-4367
E: mas@sbaitilaw.com

Kevin D. McCullough
Texas Bar No. 00788005
Rochelle McCullough, LLP
325 N. St. Paul Street, Suite 4500
Dallas, TX 75201
T: (214) 953-0182
F: (214) 953-0185
E: kdm@romclaw.com

Litigation Counsel for Adversary Plaintiff

Bankruptcy Counsel for Adversary Plaintiff

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

IN RE:

JRjr33, Inc.

           Debtor.

**Case No. 18-32123-SGJ-7**

**Chapter 7**

ROBERT YAQUINTO, In His Capacity as
Chapter 7 Trustee of JRjr33, Inc.

           Plaintiff,

v.

CNA INSURANCE COMPANIES dba
CONTINENTAL CASUALTY COMPANY,

           Defendant.

**Adversary No. 23-03086-SGJ**

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1:  Identify the appellant(s)**

1.  Name(s) of appellant(s):

         Robert Yaquinto, In His Capacity as Chapter 7 Trustee of JRjr33, Inc.

2.  Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of
     this appeal:

1

000001

For appeals in an adversary proceeding:

x Plaintiff

☐ Defendant

☐ Other (describe)

_____

For appeals in a bankruptcy case and not in an adversary proceeding:

☐ Debtor

☐ Creditor

☐ Trustee

☐ Other (describe)

## Part 2:  Identify the subject of this appeal

1.  Describe the judgment, order, or decree appealed from:

   Memorandum Opinion and Order Granting Rule 12(c) Motion
    [Adv. Proc. Doc. No. 40]

2.  State the date on which the judgment, order, or decree was entered:  <u>October 25, 2024</u>

## Part 3:  Identify the other parties to the appeal

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys:

1.  *Party/Appellee:*    Defendant: CNA Insurance Companies
                d/b/a Continental Casualty Company

Attorney:        David H. Timmins
            Spencer Fane LLP
            2200 Ross Avenue, Suite 4800 West
            Dallas, TX 75201
            T: (469) 391-7704
            F: (214) 750-3216

2.  *Party/Appellants:*  Plaintiffs:  Robert Yaquinto, In His Capacity as Chapter 7 Trustee
                of JRjr33, Inc.

Attorney:        Mazin A. Sbaiti
            Texas Bar No. 24058096
            Caleb A. Davis
            Texas Bar No. 24099666
            Sbaiti & Company PLLC
            Dallas Arts Tower
            2200 Ross Avenue, Suite 4900W
            Dallas, TX  75201
            T:  (214) 214-3400
            F:  (214) 853-4367

APP_042

**Part 4:  Optional election to have appeal heard by District Court (applicable only in certain districts):**  Not applicable.

Dated: October 30, 2024

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*

**Mazin A. Sbaiti**
Texas Bar No. 2405809
**Caleb A. Davis**
Texas Bar No. 24099666
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
    caleb.davis@sbaitilaw.com

Kevin D. McCullough
State Bar No. 00788005
R**OCHELLE McCULLOUGH, LLP**
325 N. St. Paul Street, Suite 4500
Dallas, TX 75201
T: (214) 953-0182
F: (214-953-0185
E: kdm@romclaw.com

**COUNSEL FOR PLAINTIFF**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true copy of the foregoing was delivered to all counsel of record via the Court's CM/ECF notification system on this 30th day of October, 2024.

*/s/ Mazin A. Sbaiti*
Mazin A. Sbaiti

APP_043

000003

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 18-32123-sgj-7** |
|  | ) | Chapter 7 |
|  | ) |  |
| JRJR33, INC., | ) | Dallas, Texas |
|  | ) | August 15, 2024 |
| Debtor. | ) | 9:30 a.m. Docket |
| ─────────────────── | ) |  |
|  | ) |  |
| ROBERT YAQUINTO, | ) | **Adversary Proc. 23-3086-sgj** |
| CHAPTER 7 TRUSTEE, | ) |  |
|  | ) |  |
| Plaintiff, | ) | RULE 12(c) MOTION FOR JUDGMENT |
|  | ) | ON THE PLEADINGS FILED BY |
| v. | ) | DEFENDANT CNA INSURANCE |
|  | ) | COMPANIES [18] |
| CNA INSURANCE COMPANIES, | ) |  |
| dba CONTINENTAL CASUALTY | ) | STATUS CONFERENCE |
| COMPANY, | ) | (SCHEDULING) |
|  | ) |  |
| Defendant. | ) |  |
| ─────────────────── | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For Movant/Defendant
CNA Insurance Companies:

Buffey E. Klein
David H. Timmins
HUSCH BLACKWELL, LLP
1900 N. Pearl Street, Suite 1800
Dallas, TX  75201
(214) 999-6100

For Robert Yaquinto,
Trustee, Plaintiff:

Mazin Ahmad Sbaiti
SBAITI & COMPANY, PLLC
JP Morgan Chase Tower
2200 Ross Avenue, Suite 4900 West
Dallas, TX  75201
(214) 432-2899

For Robert Yaquinto,
Trustee, Plaintiff:

Kevin Dale McCullough
ROCHELLE MCCULLOUGH, LLP
901 Main Street, Suite 3200
Dallas, TX  75202
(214) 953-0182

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02728-X   Document 21   Filed 02/06/25   Page 209 of 1734   PageID 4778

2

```
 1  APPEARANCES, cont'd.

 2  For Robert Yaquinto,          Robert Yaquinto
    Trustee:                      Nicholas Kyrillos "Nick" Gurguis
 3  (WebEx)                       SHERMAN & YAQUINTO, LLP
                                  509 N. Montclair Avenue
 4                                Dallas, TX  75208-5450
                                  (214) 942-5502
 5
    Recorded by:                  Michael F. Edmond, Sr.
 6                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
 7                                Dallas, TX  75242
                                  (214) 753-2062
 8
    Transcribed by:               Kathy Rehling
 9                                311 Paradise Cove
                                  Shady Shores, TX  76208
10                                (972) 786-3063

11

12

13

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25                 transcript produced by transcription service.
```

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02728-X   Document 21-1   Filed 10/03/24   Page 490 of 1134   PageID 4779

3

1          DALLAS, TEXAS - AUGUST 15, 2024 - 9:46 A.M.

2              THE COURT:  All right.  Our other 9:30 matter we'll

3     get to next is Yaquinto v. CNA Insurance Companies, Adversary

4     23-3086.  Let's get our lawyer appearances.

5              MR. SBAITI:  Your Honor, Mazin Sbaiti on behalf of

6     the Plaintiff, Mr. Yaquinto.  And with me is Kevin McCullough

7     and Mr. Yaquinto and Mr. Gurguis.  Mr. Yaquinto is on the -- I

8     don't know if this is Zoom.  I can't remember.  WebEx.

9              THE COURT:  WebEx.

10             MR. SBAITI:  WebEx.  And Mr. Gurguis with Mr.

11    McCullough's firm is also on with him.

12             THE COURT:  Okay.  Thank you.

13             MR. TIMMINS:  Your Honor, I'm David Timmins with

14    Husch Blackwell here on behalf of Continental Casualty

15    Company, which is the CNA entity identified as the Defendant.

16    And Buffey Klein is with me.

17             THE COURT:  Okay.  Good morning to all.

18             MR. MCCULLOUGH:  And Your Honor, one correction.  Mr.

19    Gurguis is with Mr. Yaquinto's firm.

20             MR. SBAITI:  Oh, sorry.

21             MR. MCCULLOUGH:  We wish he was with our firm.

22             THE COURT:  Oh, okay.  Well, --

23             MR. MCCULLOUGH:  He's their new associate.

24             THE COURT:  Okay.  Very good.  We're glad to have you

25    all.

4

1    All right.  Well, I will tell you, I feel a little behind

2    the eight ball here.  When I saw this set on the calendar, I

3    was like, hmm, I don't remember this adversary.  We've never

4    had any settings, obviously, in this adversary.  I guess I've

5    signed an order or two continuing things or I think I've

6    signed an order or two, amended scheduling orders.

7        So, not only that, but our hearing yesterday afternoon

8    that I thought would take 30 minutes took three hours, so that

9    cut into my prep time.

10       Anyway, I'm going to need, I guess, the longer version of

11   argument versus the shorter *Reader's Digest* version that I

12   sometimes like to hear.

13       Are we going to start out, though, with something like a

14   status conference?  I see we have a status conference as well

15   as the 12(c) motion.  So --

16           MR. SBAITI:  I believe the status conference was to

17   look at a schedule once the 12(c) motion was argued, because

18   we'd continued the existing deadlines.

19       But I stood up because I was happy to give you just a

20   basic lay of the land on how we arrived here.  This case is

21   the last step of two bankruptcies before you, the ActiTech

22   bankruptcy and the JRjr33 bankruptcy.

23           THE COURT:  Yes.

24           MR. SBAITI:  As Your Honor might recall, JRjr had

25   sued ActiTech -- JRjr, while it was a bankrupt, sued ActiTech

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02728-X    Document 21    Filed 10/06/67    Page 512 of 1274    PageID 4781

5

1    in state court right before the trial that was -- ActiTech

2    declared bankruptcy in Subchapter V.  It got removed to your

3    Court.  We had a few hearings in front of you, and then we

4    ended up settling the case with former Judge Leif Clark.  Part

5    of that settlement was ActiTech had claims against its

6    insurer, and those were assigned to the JRjr bankruptcy as

7    part of that settlement.  And so this now is those -- bringing

8    those claims against the insurer.

9                THE COURT:  Okay.

10               MR. SBAITI:  Yeah.

11               THE COURT:  All right.  Well, the first thing I want

12   to talk about here is what the Bankruptcy Court has

13   jurisdiction to do and what the Bankruptcy Court has authority

14   to do.  Because in the complaint, there was no statement that

15   we require about consent.  Well, there's no statement about is

16   it core or noncore.  If it's all noncore, does the Plaintiff

17   consent to final Bankruptcy Court adjudication?  And then I

18   see a jury trial request plastered on the front.  I can't

19   remember if the Defendants also requested a jury trial.  But

20   it doesn't really matter.  It appears there's jury trial

21   rights if one of you requests it.

22       So I'm at a little bit of a loss to know, do I have

23   authority to do anything?  I don't have the required this is

24   bankruptcy core or noncore.  And to the extent it's noncore,

25   is, do you have consent to the Bankruptcy Court entering final

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02722-B-X   Document 21-1   Filed 01/06/25   Page 52 of 134   PageID 4282

6

 1    orders?  Do you consent to the Bankruptcy Court doing a jury

 2    trial?

 3            MR. SBAITI:  I think from our perspective, Your Honor

 4    -- I apologize, that's probably my oversight -- but the -- I

 5    don't think it's core bankruptcy jurisdiction.  I think that

 6    because it's a bankrupt -- I guess it was a bankrupt, was an

 7    insured of a bankrupt -- we thought the Court still had

 8    authority, I think as you put it.  And we do consent.  That's

 9    why we filed it in your Court.  So we would consent to the

10    Court hearing the whole case.

11            THE COURT:  Okay.  Even the jury trial, ultimately?

12            MR. SBAITI:  Yeah.  I'm -- sorry to ask.  I'm

13    assuming you can hold a jury trial here.  That doesn't have to

14    go somewhere else.  So to the extent yes, --

15            THE COURT:  If everybody consents.  But --

16            MR. SBAITI:  We would consent.

17            THE COURT:  Okay.

18            MR. SBAITI:  Yes.

19            THE COURT:  All right.  Well, let me ask the

20    Defendants, then.

21            MS. KLEIN:  This is not an issue that we have really

22    discussed with our client in that -- and I think that we had

23    -- albeit there was this request, I think that we had

24    anticipated there would not be a jury trial in your court, as

25    far as that consent goes.

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02722-X    Document 2-1    Filed 01/06/25    Page 53 of 113    Page ID 2755

7

1      Could you give us -- could we take one moment just to --

2   so I could consult with my --

3          THE COURT:  All right.  And I have two things.  Do

4   you have consent, do you consent to the Bankruptcy Court

5   entering final orders?  Because this motion set before me

6   today --

7          MS. KLEIN:  Yeah.  Clearly.

8          THE COURT:  -- requires somebody to -- well, I mean,

9   I guess I need to know, do I have consent to enter final

10  orders that would dispose of claims?  And then I need to know,

11  do I have consent to preside over the jury trial?  Because if

12  I don't, I don't have a motion to withdraw the reference, but

13  we're kind of in a --

14         MS. KLEIN:  Right.  I understand, Your Honor.

15         THE COURT:  -- gap here.

16         MS. KLEIN:  Yes.

17         THE COURT:  So, you want --

18         MS. KLEIN:  If I could just talk to -- if David and I

19  can consult for a moment, and then -- then we can -- then I

20  believe that we can respond.

21         THE COURT:  Okay.  Well, I'll take a five-minute

22  break.

23         MS. KLEIN:  Thank you.

24         THE CLERK:  All rise.

25      (A recess ensued from 9:53 a.m. until 10:00 a.m.)

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02722-X   Document 21-1   Filed 01/08/25   Page 245 of 1274   PageID 4784

8

1                THE CLERK:  All rise.

2                THE COURT:  All right.  Please be seated.  We are

3    back in the record.

4         Okay.  So what does the Defendant say about this

5    jurisdictional authority quandary?

6                MS. KLEIN:  Yes, Your Honor.  Thank you for that

7    brief time for us all to confer, actually.  And we discussed

8    it, and I think we all anticipated Your Honor having the

9    ability to enter final orders and do consent.

10        However, I think we've discussed and do not require a jury

11   trial before the Court.  And I will let the Plaintiffs address

12   that issue, but we consent under -- to that -- to that extent.

13               THE COURT:  You consent to the Bankruptcy Court

14   entering final orders in this adversary?

15               MS. KLEIN:  Correct.

16               MR. SBAITI:  And we will withdraw our jury demand.

17               THE COURT:  Okay.

18               MR. SBAITI:  And so the Court -- we'll just try the

19   case to the Court, if the Court is amenable to that.

20               THE COURT:  Okay.  All right.  So we've got that on

21   the record.

22        And so the last thing I want to be clear about is the

23   bankruptcy subject matter jurisdiction and the impact on which

24   bankruptcy estate.  So, the JRjr case is still open --

25               MR. SBAITI:  Yes.

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02778-X    Document 21-1    Filed 10/06/24    Page 56 of 114    PageID 4785

9

1              THE COURT:  -- and administering administration of

2       the estate.  And so what is your argument on that?

3              MR. SBAITI:  We consent --

4              THE COURT:  Because I knew your complaint said

5       diversity jurisdiction or bankruptcy subject matter.  So let

6       me be clear about that.

7              MR. MCCULLOUGH:  We consent to the jurisdiction of

8       the Bankruptcy Court for this matter.

9              THE COURT:  Well, --

10             MR. SBAITI:  I think you have related-to

11      jurisdiction, --

12             THE COURT:  Okay.

13             MR. SBAITI:  -- not core jurisdiction.

14             THE COURT:  Okay.

15             MR. SBAITI:  And --

16             THE COURT:  So, just elaborate.  I mean, I'd have to

17      independently ascertain there is bankruptcy subject matter

18      jurisdiction.  It's not just consent to authority; it's --

19             MR. SBAITI:  Right.

20             THE COURT:  -- does bankruptcy subject matter

21      jurisdiction exists.  So, explain to me what your statement is

22      on that.

23             MR. SBAITI:  Yes, Your Honor.  It's a bankrupt --

24      it's a bankrupt bringing its claim, and the outcome of the

25      claim will substantially affect the bankruptcy estate.  The

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02722-X   Document 3-1   Filed 01/06/25   Page 256 of 1234   PageID 4786

10

1    money would go into the bankruptcy estate.  There are no third

2    parties outside of the bankruptcy estate.

3         I believe in other cases that's been sufficient to find

4    related-to jurisdiction.  It's a -- these are otherwise state

5    law claims that are being brought substantively, but they

6    belong to a bankrupt and would affect the bankrupt.

7              THE COURT:  Okay.  And if you will comment on that.

8              MS. KLEIN:  Yes.  I think that we would concur that

9    it is related-to.  These are claims that are brought pursuant

10   to a settlement agreement that was approved by this Court.

11   And they're seeking to enforce the terms of that settlement

12   agreement by bringing the claims against our client,

13   Continental Casualty, with regard to coverage issues.

14             THE COURT:  Okay.  And so, again, I've got to get

15   this clear in a write-up.  It's related to JRjr33, but not

16   necessarily ActiTech, the --

17             MR. SBAITI:  Well, in a way it is related to ActiTech

18   --

19             THE COURT:  I'm not sure if there's going to be

20   impact on that bankruptcy estate from the outcome of this.

21             MR. SBAITI:  Your Honor entered an order assigning

22   the claims in the ActiTech bankruptcy, --

23             THE COURT:  Uh-huh.

24             MR. SBAITI:  -- but assigning them to the JRjr

25   Trustee, Mr. Yaquinto.

```
 1              THE COURT:  Uh-huh.

 2              MR. SBAITI:  And I guess a part of their motion,

 3    which raises a good point that I hadn't thought of on the fly,

 4    that part of their motion is the non-assignability of some of

 5    those claims.  So, in a way, we'd be asking for the Court --

 6    for the Court to uphold its order and I guess enforce the

 7    assignment order.

 8         So there would be that dynamic of an impact on the JRjr

 9    bankruptcy, as well as the -- as well as the ActiTech

10    bankruptcy, although I believe the ActiTech bankruptcy is

11    sewed up.  But I'm not sure.

12              THE COURT:  I think there might be an appeal of the

13    --

14              MR. SBAITI:  Oh.

15              THE COURT:  -- Chapter 11 plan.  I can't say that

16    with certainty.

17              MR. SBAITI:  Once we settle, I'm not --

18              THE COURT:  Yes, I just -- you know, I never, once

19    something is appealed, I very often never hear again, --

20              MR. SBAITI:  Yeah.

21              THE COURT:  -- unless there's some sort of remand to

22    me.

23         Okay.  So there's conceivably an effect on ActiTech --

24              MR. SBAITI:  Uh-huh.

25              THE COURT:  -- as well as JR, because if an aspect of
```

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02728-X   Document 1-1   Filed 01/03/25   Page 59 of 174   PageID 4363

12

1    the settlement is unwound, who knows, there might be some

2    residual impact on that estate?

3        All right.  Well, with that, I'll hear the argument.

4            MS. KLEIN:  Thank you, Your Honor.

5            THE COURT:  And so Movants may proceed.

6            MR. TIMMINS:  Your Honor, I'm glad we got past the

7    bankruptcy stuff, because I'm just an insurance lawyer, so I

8    don't understand what any of you people are talking about.  I

9    do, for the Court's benefit, have a copy of the briefs and

10   some of the case law that I can provide Your Honor, if you'd

11   like.

12           THE COURT:  Okay.  Please --

13           MR. TIMMINS:  May I approach?

14           THE COURT:  -- approach.  Yes, and I think I'm going

15   to ask you to hand that to my law clerk, because she might be

16   reading some of the cases as you mention them.  She can

17   probably do that better than me while I try to digest your

18   argument.

19           MR. TIMMINS:  And for Your Honor's benefit, we marked

20   -- so, the initial section of the -- of the binder is the

21   motions and the response and the reply, including their

22   exhibits.  And then there's a selection of case law.  And the

23   very last tab is the Texas usury statute under which the

24   underlying case was brought.

25           THE COURT:  Okay.  And so I do have all the papers

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02772-X    Document 16-1    Filed 04/03/25    Page 59 of 113    PageID 4839

13

1  you filed, so what I don't have is the authority.  That'll be

2  in my hand, my law clerk's.

3          MR. TIMMINS:  Right.  And I won't represent to the

4  Court that that's all of the authority.  It would have been a

5  huge binder if we'd done that.  So it --

6          THE COURT:  Well, thank you for sparing us that.

7          MR. TIMMINS:  It includes the primary case law that

8  we cited, as well as the main case that the Plaintiff cited in

9  the response.

10     And also, Your Honor, just to coordinate you on the

11  binder, one of the exhibits, Exhibit A to the motion, is the

12  Continental Insurance policy that's at issue here.

13          THE COURT:  Uh-huh.

14          MR. TIMMINS:  There's not a ton of language in that

15  policy that's actually at issue, which is a good thing for all

16  of us.

17          THE COURT:  Yes.

18          MR. TIMMINS:  There are a couple of places, and

19  rather than have the Court search through that, we flagged the

20  two locations and highlighted the language that's at issue

21  here, --

22          THE COURT:  All right.

23          MR. TIMMINS:  -- which is also cited in the brief as

24  well.

25          THE COURT:  All right.

1          MR. TIMMINS:  Now, taking into account that the Court

2    has indicated that you didn't have a lot of time to look at

3    the stuff, I'll go a little bit into the facts.

4          THE COURT:  Okay.

5          MR. TIMMINS:  It is set out in the motion, obviously.

6    But I'll also try and keep it somewhat simple, at least.

7          This is an insurance coverage case that arises out of the

8    settlement of an underlying usury suit that was brought under

9    the Texas usury statute.  The Trustee in this case is

10   asserting claims as the assignee of CNA's insured, ActiTech.

11   So, CNA issued its insurance policy to ActiTech.  The claims

12   in the underlying lawsuit, the usury claims, were brought

13   against ActiTech.

14         That eventually, and I'll go into a little bit more of the

15   procedural background, eventually, the claims against ActiTech

16   that were brought by a plaintiff called Agel, which is

17   JRjr33's subsidiary, were settled in the Bankruptcy Court, as

18   the Court is aware.

19         As part of that settlement, those claims were assigned to

20   the Trustee of the JRjr33 bankruptcy estate, and so those

21   insurance coverage claims that were assigned are now being

22   brought against Continental, which is a CNA company, through

23   that assignment.

24         To orient the Court a little bit on the motion, the motion

25   originally had five separate arguments in it.  And I'm happy

1    to tell you that those have been greatly simplified by virtue

2    of the response, and so we're really now only talking about

3    two of those arguments.

4         Those arguments are, number one, that the CNA policy

5    didn't provide coverage for the usury claim against ActiTech

6    or for the subsequent settlement because this policy has a

7    specific carve-out for civil penalties like those that were

8    asserted under the usury statute in the underlying lawsuit.

9    The coverage here is for loss.  Loss has a specific definition

10   that's in the policy, but basically it said it covers damages

11   and settlements.  But that language has a specific carve-out

12   that says loss does not include civil or criminal fines or

13   penalties and a variety of other things.  And we'll go into

14   that in more detail.

15        The second argument that's one of the ones that's still at

16   issue is that the policy has an anti-assignment provision that

17   precludes all of the claims that are brought here by the

18   Trustee as an assignee.  And we'll get into it a little bit

19   more, but the Texas case law is very clear that those anti-

20   assignment provisions are enforceable and preclude exactly the

21   kinds of claims that are being brought here.

22        The other three arguments that are no longer at issue are

23   that the common law bad faith claims that the Trustee was

24   asserting are invalid as a matter of law.  That's not opposed,

25   as I understand it.

APP_058

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02728-X   Document 16-1   Filed 04/06/25   Page 253 of 1134   PageID 4592

16

1        The next argument is that the Texas Insurance Code and

2   DTPA claims that the Trustee was asserting were invalid

3   because public policy doesn't permit assignment of those

4   claims.  That also is not opposed, and so we're not going to

5   be talking about that today, either.

6        And lastly, we were arguing that the declaratory judgment

7   claims that the Trustee was bringing were invalid because they

8   simply repeated the affirmative claims.  And the case law is

9   clear that you can't have both a declaratory claim and an

10  affirmative claim that cover the same thing.  That also

11  appears to be unopposed, so we're not talking about that.

12       So, to back away a little bit and give the Court some

13  benefit of the factual background, the underlying suit was a

14  usury claim that was based on a credit agreement in which

15  ActiTech, which was a nutritional supplement provider, gave

16  its retailer, Agel, a floating line of credit for the purchase

17  of ActiTech's products.  Agel then sued ActiTech in state

18  court under the Texas usury statute -- the specific statute is

19  Texas Finance Code 305.003 and 305.001(a-1) -- claiming that

20  the agreement between Agel and ActiTech imposed interest that

21  exceeded the maximum amount allowed under the Texas Finance

22  Code's usury limitations.  That amount was a 28-percent cap on

23  interest.  And so Agel was alleging that ActiTech had charged

24  it for interest that exceeded that amount.

25       And even though those amounts were never actually paid and

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02772-X    Document 18-1    Filed 04/03/25    Page 254 of 134    PageID 4955

17

1  so there was not a reimbursement situation here, the Texas

2  Finance Code, the usury statute, permits a claim for the

3  penalties under the usury statute even if it hasn't been paid,

4  as long as it's been contracted for or charged.

5      So, Agel claimed that it was entitled to the statutory

6  civil penalty of three times the amount of illegal interest

7  charged, which is the statutorily-defined penalty.  The amount

8  of the illegal interest that was alleged was $3.7 million.

9  And so Agel was alleging that it should recover civil penalty

10  under the Texas usury statute of $11.18 million.  And that's

11  all alleged in the Ninth Amended Petition, which is Exhibit B

12  to the motion.

13      Those were the only monetary amounts that were sought in

14  the petition.  There were some other claims in the petition

15  that aren't really relevant here because they were claims for

16  declaratory relief, for injunctive relief, and to unwind some

17  allegedly fraudulent transfers.  But the only thing that's at

18  issue for purposes of today is the usury claims with civil

19  penalties that were statutorily available under the Finance

20  Code.

21      The litigation proceeded for quite a while in the state

22  court.  In January 2022, the case was removed to this Court

23  after ActiTech filed bankruptcy.

24      In July of 2022, Agel and ActiTech settled the claim for

25  $2.75 million.  And as part of that settlement, ActiTech

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02783-X    Document 68-1    Filed 04/08/25    Page 25 of 174    PageID 4984

18

1   assigned its claims to the JRjr33 Bankruptcy Trustee.  And as

2   the assignee of those claims, JRjr33, through the Trustee,

3   sued CNA in October of 2023, alleging breach of contract, bad

4   faith violations of the Insurance Code and DTPA, and

5   declaratory relief.

6       So, the first thing I want to talk about is the specific

7   policy language at issue.  And that policy language is in

8   Exhibit A, which is the full policy.  And as I mentioned, the

9   flagged portions are the parts that have the relevant portion

10  of the policy language.

11          THE COURT:  All right.  As you talk about them, since

12  I gave my law clerk the notebook -- yes, maybe, I was going to

13  say point out the pages you're on, but --

14          MR. SBAITI:  Your Honor, I have an additional copy of

15  it.  Would you like a copy of the --

16          THE COURT:  Well, no, --

17          MR. SBAITI:  -- of the policy?

18          THE COURT:  -- I've got a copy that I've just given

19  to Courtney, --

20          MR. SBAITI:  Oh, okay.

21          THE COURT:  -- but his, but he said he flagged the

22  sections --

23          MR. SBAITI:  He did.  Yes.

24          THE COURT:  -- he's going to talk about.  So, thank

25  you.  I'll --

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02728-X    Document 16-1    Filed 01/09/25    Page 256 of 134    PageID 4895

19

1          MR. TIMMINS:  I even did it for Mr. Sbaiti.  I'm that

2     nice a guy.

3          MR. SBAITI:  I was going to give her my flagged

4     version, but that's all right.

5          THE COURT:  Oh, I didn't know you're going to give me

6     --

7          MR. SBAITI:  Because I have my own copy, so --

8          THE COURT:  Well, we'll let you have a flagged copy

9     while he goes through it.

10          MR. SBAITI:  Okay.

11          THE COURT:  Thank you.  I got it.

12          MR. TIMMINS:  So, if you're looking at that Exhibit A

13     in the binder, Your Honor, --

14          THE COURT:  Uh-huh.

15          MR. TIMMINS:  -- the first thing to look at is

16     actually the second flag, which, to orient you with the Bates

17     numbers at the bottom right, it's CNA 55.

18          THE COURT:  Okay.

19          MR. TIMMINS:  This is the basic insuring agreement.

20     And the one that we're talking about is, at the top of the

21     page, under Subsection C, the Insured Entity Liability.  And

22     so ActiTech, to orient the Court, would be the Insured Entity.

23     This insuring agreement says the Insurer shall pay on behalf

24     of the Insured Entity that loss in excess of the retention, if

25     any, and up to the applicable limit of liability, resulting

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02723-X    Document 16-1    Filed 04/02/25    Page 257 of 1734    PageID 4586

20

1  from any claim first made during the policy period or the

2  extended reporting period, if applicable, against the Insured

3  Entity for a wrongful act.

4      The relevant language there is loss.  So the insuring

5  agreement calls for the payment of loss made -- for claims

6  against the Insured Entity for a wrongful act.

7      So then we would look at how loss is defined.  And that is

8  the first flagged part of the policy, which is CNA -- on Page

9  CNA 48.  And you'll see there it has a definition of loss.  At

10  the very top of that definition, it says loss means, and the

11  first section is damages, settlements, judgments, et cetera,

12  et cetera.

13      The relevant part is the carve-out that appears at the

14  bottom of that page, where it says, In addition to the above,

15  and solely with respect to the directors and officers

16  liability coverage part, loss does not include (1) civil or

17  criminal fines, penalties, taxes, sanctions, or forfeitures

18  imposed on an insured, whether pursuant to law, statute,

19  regulation, or court rule, other than -- and it goes on --

20  civil fines or penalties imposed under the HIPAA statute.

21      And so that is the carve-out that we're primarily dealing

22  with today.  And the specific part of that is the part that

23  deals with civil or criminal penalties, because that's what

24  we're talking about under the usury statute, is civil

25  penalties.

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02722-X   Document 16-1   Filed 03/07/25   Page 253 of 1134   PageID 4997

21

1     Now, there are several reasons that the carve-out applies

2  here, and so I want to run through those and I want to try and

3  keep it as simple as possible.

4     First and foremost, the carve-out for civil penalties,

5  where it says, Civil penalties are not loss and therefore

6  aren't covered by the policy, applies because the petition in

7  the underlying suit sought exclusively the civil penalties

8  that were available under the Texas usury statute.

9     Exhibit B to the motion is the Ninth Amended Petition that

10  was filed in the underlying lawsuit.  And that petition

11  repeatedly referred to the claim as being one for civil

12  penalties under the Texas Finance Code.

13     For the Court's benefit, we summarized the relevant

14  allegations.  And so may I approach?

15         THE COURT:  You may.  And you've got copies for

16  everyone of that, right?  Okay.  Thank you.

17         MR. TIMMINS:  And so what I just handed Your Honor is

18  a demonstrative exhibit that is excerpts from the Ninth

19  Amended Petition, which is Exhibit B to the motion to dismiss,

20  where Agel as the plaintiff in that case was making usury

21  claims against ActiTech, alleging that it was entitled to

22  civil penalties.  And so Paragraph 12 says, Performing the

23  relevant calculations, at least $3.7 million of the total

24  interest ActiTech charged Agel during this time frame was

25  illegal, and under Texas Finance Code 305.001(a-1), ActiTech

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02772-X    Document 18-1    Filed 03/08/25    Page 259 of 134    PageID 4908

22

1    and its general partner, Active Group Management, LLC, owe

2    Agel a civil penalty equal to three times the amount of

3    usurious interest they charged, or $11,181,192.78.

4        So the relevant part of that allegation is that they owe

5    Agel a civil penalty under the Texas Finance Code.  That gets

6    repeated in the subsequent paragraphs -- Paragraph 17,

7    Paragraph 56, and Paragraph 68 -- all of which refers to the

8    liability that ActiTech faced under the Texas Finance Code

9    being a civil penalty.

10        And I'll tell you, Your Honor, it's very rare that you

11    find situations in a case where you're dealing with liability

12    insurance where the allegations in the underlying lawsuit so

13    distinctly match up with the carve-out language that's in the

14    policy.  They usually just don't have that much of a match.

15    In this case, the underlying lawsuit exclusively and

16    repeatedly said, what we're entitled to is the civil penalties

17    available under the Texas usury statute.  The carve-out is for

18    civil penalties.  There couldn't be a more obvious match

19    between the relevant policy language and the allegations in

20    the underlying lawsuit to make it clear that this did not

21    qualify as loss.

22        Now, keep in mind, Your Honor, that the same lawyers that

23    represented Agel in the usury suit are the ones that are now

24    representing the Trustee.  So it's the same folks that made

25    those allegations that they were entitled to civil penalties

APP_065

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02778-X   Document 18-1   Filed 03/03/25   Page 250 of 1734   PageID 4919

23

1    as the ones that are now claiming that those are not really

2    civil penalties.  And so the concern that I have here is the

3    attempt to run away from the allegations that were made in the

4    underlying lawsuit in an effort to create coverage.  That

5    simply can't happen where the language is so clearly matching

6    up.

7        Now, secondly, Your Honor, the main argument that

8    Plaintiff in this case makes is that the civil penalties that

9    they were seeking in the underlying lawsuit are not the same

10   civil penalties as the policy is talking about.  And that's

11   based primarily on the *Flagship Credit* case, which is the

12   Fifth Circuit's 2012 decision, which in its ruling restricted

13   penalties in that case under that specific policy language to

14   amounts that are paid to the Government.

15       And so in that case, which wasn't a usury case, the Fifth

16   Circuit applied a rule of construction and said, in language

17   that deals with penalties, taxes -- I'm sorry -- fines,

18   penalties, or taxes, we're going to construe that as meaning

19   only amounts that are paid to the Government.  That was based

20   on a rule of construction the Court applied in that case,

21   which was basically that a list of things that are contained

22   in a policy should be construed in a way that have a

23   commonality.  And that Court said, well, because penalties is

24   surrounded by fines and taxes, which are amounts that are paid

25   to Government, we're going to assume that penalties was

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02722-X   Document 6-1   Filed 04/09/25   Page 231 of 274   PageID 4390

24

1  intended to be that, too, and we will construe penalties as

2  meaning only things that are paid to the Government.

3          THE COURT:  And what was the name of that case again?

4          MR. TIMMINS:  It is *Flagship Credit*.

5          THE COURT:  Okay.

6          MR. TIMMINS:  Which is the second tab in the case law

7  in the binder, Your Honor.

8          THE COURT:  Okay.

9          MR. TIMMINS:  The cite is 481 F.App'x 907.

10         THE COURT:  Okay.

11         MR. TIMMINS:  Now, there are several reasons that we

12 don't think *Flagship Credit* has any relevance to this case,

13 Your Honor, so I'll run through those.

14         THE COURT:  Okay.

15         MR. TIMMINS:  The first thing to know about *Flagship*

16 *Credit* is it was an unpublished case and is designated by the

17 Fifth Circuit as having precedential value only for law of the

18 case or collateral estoppel.  So it doesn't have any

19 precedential value here.  It can be cited, but it doesn't --

20 it's not controlling.  It doesn't have precedential value.

21     Second, the main issue about *Flagship Credit* is it

22 involved very different language.  And, again, may I approach,

23 Your Honor?

24         THE COURT:  You may.  Thank you.

25         MR. TIMMINS:  Now, what I've handed Your Honor is a

APP_067

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02722-X    Document 1-4    Filed 08/05/24    Page 72 of 174    PageID 4901

25

1    comparison between the policy language in the CNA policy

2    versus the policy language in the policy that was issued in

3    *Flagship Credit*, was actually issued by company called Indian

4    Harbor.

5        In the *Flagship Credit*, the Indian Harbor policy said,

6    Loss will not include fines, penalties, or taxes imposed by

7    law.  So that was the entire scope of the relevant language in

8    that case.

9        In the CNA policy, the language is more extensive.  It

10   says, In addition to the above, and solely with respect to the

11   directors and officers liability coverage part, loss does not

12   include civil or criminal fines, penalties, taxes, sanctions,

13   or forfeitures imposed on an insured, whether pursuant to law,

14   statute, regulation, or court rule, other than those HIPAA

15   penalties.

16       Obviously, the primary difference between those is the CNA

17   policy specifically refers to civil or criminal fines or

18   penalties, whereas the language in *Flagship* doesn't address

19   civil or criminal fines or penalties at all.  It just says

20   penalties.

21       And so what the Fifth Circuit did when it was looking at

22   that is it said, well, penalties is sandwiched in between

23   fines and taxes, and so we're going to construe that as being

24   amounts paid to the Government.

25       *Flagship Credit* was a class action in which the plaintiffs

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02722-X    Document 1-6    Filed 02/26/25    Page 73 of 114    PageID 4902

26

1    were seeking statutory damages for the failure to provide

2    notice of default in connection with automobile financing.  So

3    it was not a usury case.  The damages that were at issue were

4    the amount of the credit service charge that had been assessed

5    plus 10 percent.  The district court, when -- and I believe it

6    was Gray Miller -- when Judge Miller addressed it, he found

7    that that was a civil penalty that was not covered by the

8    policy.  It was subject to the exclusion for penalties in that

9    language.

10    The Fifth Circuit, when it reviewed it, agreed that the

11    statutory damages were a civil penalty.  So it looked at Judge

12    Miller's assessment of it and agreed with him that those

13    statutory damages would qualify as a civil penalty and a

14    statutory penalty, but it found that it wasn't the kind of

15    penalty that was excluded from loss under that specific policy

16    language because that language didn't specifically address

17    civil penalties.

18    The Court applied the rule of construction that a list of

19    words should be interpreted as having a common meaning, so

20    penalties should be limited to amounts paid to the Government.

21    Here, though, the CNA policy specifically refers to civil

22    or criminal penalties, so it's not subject to the same rule of

23    construction.  If you construe the usury penalty as being a

24    civil penalty, as it should be, and analogous to what the

25    district court found in the *Flagship Credit* case, then it

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02772-X    Document 63-1    Filed 02/07/25    Page 73 of 113    PageID 4905

27

1   falls specifically within the language of the carve-out in the

2   CNA policy and the rule of construction that was applied by

3   the *Flagship Credit* court would not apply here.

4       The other thing about the language that I've shown Your

5   Honor as part of that demonstrative is that the list is

6   different than the one in *Flagship*.  In *Flagship*, the language

7   dealt only with fines, penalties, or taxes, which -- and the

8   Court said all of those are amounts paid to the Government.

9   In the CNA policy, the language is more extensive.  It refers

10  to fines, penalties, and taxes, but also refers to sanctions

11  or forfeitures.

12      It's relevant to note that sanctions and forfeitures are

13  not necessarily amounts that are paid to the Government.  And

14  so even applying the same rule of construction that the Court

15  in *Flagship Credit* did, you would not be able to find that all

16  of those have a common meaning of being amounts paid to the

17  Government, because sanctions or forfeitures could easily be

18  amounts that are paid to an individual as opposed to the

19  Government.

20      In fact, if the Court were to look at the *Black's Law*

21  definition of forfeiture, that definition refers specifically

22  to amounts that are a punishment annexed by law to some

23  illegal act or negligence whereby he loses all his interest

24  therein and they go to the party injured as a recompense for

25  the wrong which he alone or the public together with himself

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02722-X   Document 16-1   Filed 04/08/25   Page 235 of 1174   PageID 4964

28

 1 | has sustained.

 2 |    It also refers to amounts paid as compensation for the

 3 | offense and injury committed against him to whom they are

 4 | forfeited.

 5 |    So the rule of construction that the *Flagship Credit* court

 6 | applied in that case simply wouldn't be applicable here.

 7 |    Now, the third thing is that *Flagship Credit* didn't

 8 | involve usury.  And it's incredibly important for this

 9 | particular case that usury is, for want of a better phrase, a

10 | weird creature.  There's not a lot of case law that deals with

11 | usury claims in the insurance coverage context, Your Honor.

12 | And so the -- it requires some analysis of other cases to be

13 | able to address what usury really involved.

14 |    But usury, the reason it's a bit of a unique creature is

15 | because it's really intended as a punishment.  It's not a

16 | statutory damages or intended to reimburse somebody for

17 | amounts that they have been required to pay.  It's intended as

18 | a punishment.  In fact, Texas cases have frequently referred

19 | to it as a punishment.

20 |    The *Steves Sash & Door* case from the Texas Supreme Court

21 | in 1988, which is attached as part of the case law that's in

22 | the binder, says, "The penalty in usury cases given to the

23 | usuree is a boon or windfall which he is allowed to receive as

24 | punishment to the usurious lender, not as interest for the use

25 | of the borrower's money."

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02772-X   Document 63-1   Filed 01/09/25   Page 75 of 113   PageID 4905

29

1      There was a variety of cases that we've cited in the

2   motion and the reply, including *Express Working Cap. v.*

3   *Starving Students*, which is from the Northern District of

4   Texas in 2014 and is the first tab in the case law that refers

5   to the usury statute as being penal in nature.

6      And so even if the Court were to apply the kind of

7   construction that the *Flagship Credit* court did and said it's

8   really intended to address those kind of situations where

9   there's amounts that are being assessed to the Government,

10   assessed against someone and paid to the Government, usury is

11   really more in the nature of that.  It's a penalty that's

12   assessed as a punishment, not as reimbursement for damages

13   that have been incurred by the person that's the victim of the

14   usurious interest.

15      So, here, the amounts that were being alleged by Agel

16   weren't compensation for Agel's loss because Agel didn't pay

17   anything.  So the sum of money was distinct from compensation

18   for loss, and is consistent with the definition of penalty

19   used in *Flagship*, even if the Court were to believe that

20   that's a correct rule of construction to apply in this case.

21      Now, the last thing, Your Honor, is that there are

22   multiple Texas cases that refer to the usury remedy as being a

23   civil penalty.  We've cited a variety of them.  The *Steves*

24   *Sash & Door* case from the Texas Supreme Court in 1988 refers

25   to the statute as providing a spectrum of penalties for

1    usurious practices.  The *Leteff v. Roberts* case from Houston

2    in 2018 refers to it being a statutory penalty.  There's four

3    or five other cases that we've cited in the motion.  And

4    there's really, as far as I know, not a disagreement from the

5    Plaintiff that those are considered to be penalties.

6         Now, Your Honor, that brings us to the second major

7    argument, which is the anti-assignment provision.  And on this

8    one I'll be a little bit more brief.  So, there is no dispute

9    that either the policy has an anti-assignment provision or

10   that, generally speaking, anti-assignment provisions in a

11   policy are generally enforceable and preclude assignments of

12   claims under an insurance policy.

13        The only real issue here is whether that anti-assignment

14   provision is overridden by the Bankruptcy Code Section 365(f),

15   which effectively says that anti-assignment provisions in an

16   executory contract that's assumed by a trustee are not

17   enforceable.

18        So, the issue with respect to 365(f) is whether this would

19   be considered an executory contract.  And the simple response

20   to that is this can't be an executory contract because the

21   policy had expired years before the bankruptcy petition was

22   filed.

23        As I understand the Plaintiff's argument, they believe

24   that as long -- that even for an expired policy for which all

25   the premiums have been paid, if there is any lingering

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02723-X   Document 68-1   Filed 04/08/25   Page 78 of 114   PageID 4907

31

1   obligation that could be owed by the insurance company, it

2   would be considered an executory contract that could be

3   assumed by a trustee.  But that's contrary to the vast

4   majority of the case law out there.

5        We've cited the Court to a bunch of different cases.  One

6   of those is the *In re CVA General Contractors* case, which is

7   267 B.R. 773, from the Western District of Texas, a bankruptcy

8   case in 2001, which walked through the relevant principles of

9   this, that discussed the *Countryman* definition of executory

10  contracts and applies it in that case.  And that court found

11  that where a policy is expired before the bankruptcy is filed,

12  it is -- and all the premiums have been paid, it is not an

13  executory contract.

14       It says, "Courts reason that when an insurance contract

15  has been terminated prior to the date of the filing of the

16  petition, there remain no existing contracts, executory or

17  otherwise, for the trustee to either assume or reject."  And

18  that court made a specific distinction between a trustee's

19  ability to assume or reject a policy as part of a bankruptcy

20  filing and the ability to enforce the policy on behalf of the

21  estate.

22       So, a policy that has been expired for which there may be

23  claims pending out there or for which there may be some kind

24  of ongoing obligation can still be enforced by the bankruptcy

25  trustee on behalf of the estate, but it's not an executory

1    contract that can be assumed, and therefore Section 365(f)

2    would not prevent the application of the anti-assignment

3    provision.

4              THE COURT:  Okay.

5              MR. TIMMINS:  The response --

6              THE COURT:  Is that case in your materials?

7              MR. TIMMINS:  The *CVA* case is Tab 4 in --

8              THE COURT:  Okay.

9              MR. TIMMINS:  -- the -- in the selected case law that

10   we've attached.

11             THE COURT:  Okay.  Got it.  Okay.  Leif Clark.  Isn't

12   that interesting.  He's the guy that mediated, right?

13             MR. TIMMINS:  Yes, Your Honor.  That's correct.

14             THE COURT:  Okay.

15             MR. TIMMINS:  The Plaintiff relies on a case called

16   *Charter School Solutions v. GuideOne*, which is a subsequent

17   Western District of Texas case in 2019.  And that case is

18   interesting, Your Honor.  And, unfortunately, I didn't attach

19   that one.  Mr. Sbaiti may have a copy to give you.  That case

20   basically just disagreed with the majority of the case law and

21   disagreed with *CVA*.  It recognized that there was case law

22   going the other way.  It just didn't like it, and so it

23   rejected the principles outlined in *CVA* and effectively said

24   that, as long as there were any continuing obligations from a

25   policy after it expired, which is always going to be the case

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02772-B-X    Document 16-1    Filed 08/13/25    Page 79 of 113    PageID 5309

33

1    with liability policies, the policy would remain executory and

2    could still be assumed by the trustee.

3        I would submit to the Court that that case is an outlier

4    that's inconsistent with the vast majority of the case law and

5    is obviously inconsistent with the *CVA General Contractors*

6    case, which did a fairly in-depth analysis of the definition

7    of executory contract under the *Countryman* definition.  And so

8    we think that *Charter School Solutions* is simply an outlier

9    that was wrongly decided.

10            THE COURT:  And who wrote that opinion?

11            MR. TIMMINS:  I would tell you if I knew that, Your

12    Honor, but I don't have that in front of me.

13            THE COURT:  Okay.  Mr. --

14            MR. SBAITI:  Judge Cardone.

15            THE COURT:  Oh, it's a district judge?

16            MR. SBAITI:  Yes, ma'am.

17            MR. TIMMINS:  Yes.

18            THE COURT:  Okay.

19            MR. TIMMINS:  So, Your Honor, from our standpoint,

20    this case is easily decided simply by looking at the Ninth

21    Amended Petition and the underlying lawsuit and seeing the

22    allegations about civil penalties that are included there and

23    comparing it to the carve-out language from the definition of

24    loss for civil penalties.

25        If you look at the Ninth Amended Petition and you see the

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02772-B-X   Document 18-1   Filed 04/09/25   Page 341 of 1734   PageID 5020

34

1    repeated arguments that they are seeking civil penalties, and

2    you look at carve-out, there's no doubt that this is a claim

3    that simply isn't covered.  It's not loss under the CNA

4    policy.  And we think that resolves the issue.

5        There is another issue out there about the viability of

6    the *Stowers* claim, because they've asked the Court to let them

7    amend their pleading, notwithstanding the dismissal of the --

8    the agreement that the other claims would be dismissed.  As I

9    understand it, they're arguing that they should be allowed to

10   amend to assert a *Stowers* cause of action, which was partly

11   included in the bad faith claim, to some extent.

12       But my position on that, Your Honor, is to amend to state

13   a *Stowers* claim would require that there be a possibility of

14   coverage because coverage is a prerequisite to a *Stowers* claim

15   for breach of a duty to settle.  And therefore, if the Court

16   determines there is no coverage by virtue of these other

17   arguments, then the amendment to state a *Stowers* claim would

18   be futile anyway and so it's irrelevant.  But to the extent

19   that Mr. Sbaiti wants to address that, I can address that

20   further after his argument.

21           THE COURT:  All right.

22           MR. TIMMINS:  Thank you, Your Honor.

23           THE COURT:  Thank you very much.

24       All right.  Mr. Sbaiti?

25           MR. SBAITI:  Thank you, Your Honor.  As Your Honor

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02772-B-X   Document 6-1   Filed 01/02/25   Page 312 of 124   PageID 5031

35

1    knows, the case started off many, many years ago.  It started

2    off in state court.  It was stayed when the JRjr bankruptcy

3    was filed.  It was unstayed by Your Honor so that we could

4    proceed with the claims in state court.  It was then removed

5    to Your Honor's Court in the ActiTech Subchapter V bankruptcy

6    last year in January.  Settled by Judge Clark I want to say in

7    July.  I don't think it actually got fully finalized until a

8    few months later.  I think the date of Your Honor's final

9    order is October 7th of 2022.  So, two years ago.  I meant to

10   say settled in July of 2022.  And so we're well down the line

11   and hopefully nearing the end of this particular saga.

12       This is a motion, a 12(c) motion.  So they are saying the

13   pleadings are closed.  They could have brought these as a

14   12(b)(7) motion, or a 12(b)(6) motion, rather, raising these

15   same issues.  They didn't.  So we haven't had a chance to

16   amend to correct any pleading defects.  There's -- we're not

17   anywhere near the end of discovery.  And I think if these

18   issues are truly pleading issues, they should have been raised

19   early in a 12(b)(6).  And as a 12(b)(C) -- as a 12(c) motion,

20   this was literally filed the night before we mediated this

21   particular case with Judge Hale, which unfortunately didn't go

22   anywhere, but that was back in April.  So the parties have

23   made a good faith attempt to mediate the case.

24       But I think our case is simple.  The insurance company had

25   a chance to settle this.  We sent a *Stowers* demand for policy

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02727-X    Document 6-1    Filed 04/06/25    Page 242 of 1734    PageID 5042

36

1    limits.  The policy was about a million dollars.  I think the

2    policy had been whittled down a little bit, maybe to something

3    like 850 grand.  But we -- the *Stowers* demand sought policy

4    limits.  And they denied coverage.  And we never got a denial-

5    of-coverage letter back, but when counsel explained to us --

6    not these counsel, but counsel representing one of the parties

7    at the time, Mr. Bishop -- basically told us that the reason

8    that coverage was denied -- this was his verbal explanation;

9    I'm just giving it for background -- was because of the

10    intentional acts exclusion that was in the policy.

11        And the lawyer at my firm who was handling the case at the

12    time unfortunately is since deceased.  He, 35-year-old,

13    unfortunately, passed away way, way too young.  It was very

14    sad.  But, in any event, he was the one handling the case, so

15    I ended up taking over the case at the time that he wasn't

16    able to anymore.  So I'm actually one of the newer lawyers on

17    the case, in a personal capacity.

18            THE COURT:  Who was the lawyer that passed?

19            MR. SBAITI:  His name was Michal Zapendowski.

20            THE COURT:  Okay.  Never knew him.

21            MR. SBAITI:  Yeah.  I don't know that he appeared in

22    front of you.

23            THE COURT:  Okay.

24            MR. SBAITI:  He passed right as the case moved into

25    -- moved into your court, Your Honor.

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02728-X    Document 63    Filed 04/07/25    Page 294 of 1234    PageID 5053

37

1          THE COURT:  Okay.

2          MR. SBAITI:  But in any event, I say that to say, you

3    know, in reading their motion, you know, one of the things,

4    one of the reasons we've dropped some of the claims that were

5    brought is, you know, on the non-assignability of some of the

6    statutory insurance claims, for example, we agreed to drop

7    because we didn't think that the order Your Honor signed for

8    the assignment was specific enough to overcome the non-

9    assignability of those particular claims, to overcome the

10   state's public policy that those claims couldn't be

11   assignable.  And so rather than, you know, cause a bunch of

12   brain damage trying to argue why we think nonetheless it

13   should go, we decided to drop them and just simplify the case.

14        It leaves us with two claims, a breach of contract, breach

15   of the insurance agreement, which I agree with counsel:  If

16   Your Honor decides that there's no coverage because of the

17   definition of loss, which I'll address pretty -- in a moment,

18   I think if Your Honor decides that there is no coverage, yeah,

19   us amending is probably futile.  I agree with counsel on that.

20        But we believe we do have a *Stowers* claim.  What we asked

21   for is if you think we should plead the *Stowers* claim

22   separately, as its own count.  Because the first count is

23   really the breach of the duty to settle the case.  And so that

24   gave rise to, in our count, three different things.  It was a

25   breach of contract, it was a breach of the good faith and fair

APP_080

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02722-X    Document 1-41    Filed 04/08/25    Page 345 of 1734    Page ID 5064

38

1  dealing, and it was a breach of the *Stowers* -- there was a

2  *Stowers* claim that came.  We bundled those into one claim.

3      We've dropped the good faith and fair dealing claim, as

4  counsel said.  So it leaves us with the two claims.  They're

5  bundled in one count.  They said, well, you didn't really

6  plead a *Stowers* claim.  All we said was, if you think we

7  should plead it as a separate claim, we'll plead it as a

8  separate claim.  But we believe we do have a *Stowers* claim

9  that's live.

10      The argument they address most robustly in their reply is

11  the penalties exclusion that counsel spent quite a bit of time

12  on today as well.  And I'll address that first.

13      Now, they didn't bring that case up, the *Flagship* case,

14  they didn't bring it up in their opening brief.  The first

15  time they addressed it was in their reply brief in response to

16  our response.  This is really the first chance I'm getting to

17  address the arguments that they wrote in their reply and then

18  the arguments that counsel brought up.

19      I actually have, similarly, a presentation.  If I could

20  approach, Your Honor, with it.

21          THE COURT:  You may.

22          MR. SBAITI:  I've got a -- it's a few more pages, but

23  I also -- we had the same idea.  May I approach, Your Honor?

24          THE COURT:  You may.  Copies for everyone?  Awesome.

25  Thank you.

APP_081

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02772-X   Document 1-1   Filed 08/09/24   Page 346 of 1734   Page ID 5075

39

1          MR. SBAITI:  I put the whole policy language as

2    recounted by the *Flagship* court.  And I would use this as a

3    guide, Your Honor, because the *Flagship* policy language says

4    loss does not include fines, penalties, or taxes imposed by

5    law, whereas here it's civil or criminal fines, comma,

6    penalties, comma, taxes, comma, sanctions or forfeitures

7    imposed on an insured, whether pursuant to law, statute,

8    regulation, or court rule.

9          And then I think this is a very important part.  Other

10   than those civil fines or penalties imposed under 42 U.S.C. §

11   1320d-5(a) of HIPAA.

12         And I'm going to go a little bit backwards and point out

13   that other than those civil fines or penalties -- so, civil

14   fines or penalties are payable to the Government.  That's what

15   *Flagship* held.  And counsel tried to make an argument to you

16   that this is supposed to go beyond civil fines or penalties

17   payable to the Government; this is supposed to also encompass

18   civil fines and penalties payable to a private litigant.

19         The *Flagship* court held because of -- I think the canon is

20   -- I don't know, I'm a boy from Carrollton -- I think it's

21   *noscitur a sociis*, is the Latin phrase.

22              THE COURT:  Uh-huh.

23              MR. SBAITI:  Whatever.  It's, you know, you've got to

24   read everything together, basically, is what the Fifth Circuit

25   held.

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02722-X   Document 11-1   Filed 01/06/25   Page 367 of 1734   PageID 5086

40

1              THE COURT:  Uh-huh.

2              MR. SBAITI:  And the Fifth Circuit, in looking at

3    *Flagship*, held four things, actually.

4         The first thing they held is -- well, the way they framed

5    the question was whether a statutory minimum damages statute,

6    which is the UCC statute that was before them, had statutory

7    minimums, which is payable to a private litigant is -- whether

8    that's excluded by the language of fines, penalties, or taxes.

9    The Fifth Circuit then said, in answering that it's not

10   included, had actually four planks to the premise.  And that's

11   what I laid out on Page 2 of that presentation, Your Honor.

12        The first thing the Fifth Circuit said is they agreed with

13   the lower court that the term penalties, just the common law

14   word penalties, in and of itself includes civil and criminal

15   penalties.  So they didn't construe the definition of

16   penalties as being strictly civil or strictly criminal.  They

17   said the word penalties always includes both civil and

18   criminal penalties.

19        So, right away, the addition in the CNA policy of the word

20   civil or criminal at the beginning becomes a distinction

21   without a difference because the Fifth Circuit already

22   contemplated that the word penalties meant both civil and

23   criminal.

24        The next thing they said is they agreed that civil

25   penalties could be paid either to the Government or to a

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02728-X   Document 16-1   Filed 04/07/25   Page 248 of 274   PageID 5309

41

1    private litigant, which is what the court below had held.  And

2    that's at Page 911.  And they cited *Black's Law Dictionary*,

3    basically saying, you know, this is a statutory penalty.

4        The third thing they pointed is that the statutory minimum

5    damages before are indeed -- were civil penalties under the

6    usual definition of the term, but were of a type payable to a

7    private litigant.

8        So they're already agreeing, yes, the word penalties, the

9    definition of the word penalties by itself goes to -- is a

10   civil penalty -- would cover civil penalties payable to a

11   private litigant.  So, so far, you know, everyone is on the

12   same page.

13       Where they departed from the district court, and they use

14   -- literally use the word, everything the district court has

15   said is reasonable, but where we disagree is you've got to

16   read it with words taxes and fines.  And I'll get to the new

17   construction in a second.

18       And the Court basically says, everyone agrees taxes are

19   only payable to a government.  Right?  And it's this word

20   fines that could be both.  And they say, just because fines

21   sometime somewhere, in a loosey-goosey sense, can be used to

22   mean fines payable to a private litigant, fines, under the

23   definitions -- they cite some case law and they cite *Black's

24   Law* saying fines are payable to the Government.  So we think

25   penalties, likewise, are payable to the Government.

**APP_084**

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02772-X    Document 161    Filed 04/03/25    Page 349 of 1234    PageID 5103

42

1        That was their conclusion.  And that's actually the

2   conclusion that's on the third slide in the presentation.

3   Well, it's not a slide here, but the third page.  And I just

4   created it for Your Honor to sort of highlight the important

5   parts.

6        So, and that was according to the canon of construction.

7        So, they say, Accordingly, the statutory-minimum-damages

8   portion of the *Hartt* settlement is not a penalty within the

9   meaning of the exclusion.

10       And so the addition of -- and so this comes back to the

11  first page.  So, the addition of the word civil or criminal at

12  the very beginning, which is what they argued in their reply,

13  that that was the material difference, that that somehow

14  changes things, we don't think it changes anything.

15       To address the argument that counsel made right now --

16  which wasn't in the actual reply, but I'll address it

17  nonetheless -- is he attempts to say, well, you know, you can

18  look at forfeitures and sanctions as being payable to private

19  litigants as well, as if that somehow changes the analysis on

20  what fines or taxes mean.

21       The Fifth Circuit held fines and taxes are payable to the

22  Government in their ordinary meaning.  I don't think we can

23  escape that holding.

24       Sanctions and forfeitures are also payable to a

25  Government.  Even if we were to concede sometimes sanctions

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02772-X    Document 16-1    Filed 04/07/25    Page 350 of 1734    PageID 5119

43

1    are payable to a private litigant and sometimes forfeitures

2    are payable to a private litigant, that somehow that doesn't

3    necessarily get us out of the holding of *Flagship* that you've

4    got to read all the words together.  And because taxes,

5    penalties, sanctions, and forfeitures all together, they're

6    all payable to the Government in some sense, even though they

7    may also be payable to nongovernment entities, to civil

8    litigants, to private litigants, that doesn't escape the rule

9    of construction the Fifth Circuit imposed.

10        I admire the attempt to say, well, these also have other

11    definitions.  But given that we've already conceded that

12    penalties are payable to private litigants and that didn't

13    sway the Fifth Circuit, the fact that sanctions or forfeitures

14    might also be payable to private litigants likewise wouldn't

15    get us out of the conclusion.

16        But I actually think they added something in this policy

17    that hurts even the construction he was attempting to foist,

18    which is that there's a callback to those civil fines and

19    penalties in HIPAA, because those are only payable to the

20    Government.

21        So it's very clear that when you read this entire

22    provision that he's quoted you and that I've quoted you, that

23    what these are talking about are civil fines payable to a

24    government or civil penalties payable to the Government and

25    would still fall within the rubric of *Flagship*, of the

APP_086

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02722-X    Document 16-1    Filed 04/09/25    Page 91 of 134    PageID 5320

44

1     *Flagship* case.

2        Now, counsel, I think, tries to take issue with our

3 response where we said, you know, we also asked for damages,

4 and so just because we called these penalties doesn't mean

5 they're necessarily penalties. And the only argument I'll say

6 on that, Your Honor, is that where we got that argument from

7 is that in some parts of the usury statute they use the word

8 penalties. Specifically, criminal penalties. The word is

9 there. And if you look at Page 4 of the slide, there are a

10 whole bunch of statutes that impose civil penalties, but they

11 call them penalties. They use the word penalties.

12        Section 305.001(a-1) of the Texas usury statute, which is

13 what we sued under, nowhere uses the word penalties. And I'll

14 point out to Your Honor that on the last page of our state

15 court petition, which is what he cited to you, we seek -- our

16 prayer for relief asks for damages, including statutory

17 damages under the usury statute. So we were seeking damages

18 in that case.

19        And that was a point of contention with former counsel for

20 ActiTech. One of their arguments that they had wanted to

21 bring but we settled before it got fleshed out was whether we

22 could seek damages separate and apart from treble damages.

23 Because the fact that the usury that was committed pushed JRjr

24 into bankruptcy, there were actually consequences, downstream

25 damages that we wanted to be able to at least argue at trial,

APP_087

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02728-X   Document 34   Filed 04/07/25   Page 252 of 274   PageID 5231

45

1   but we just never got that far.  But we do claim damages in

2   our prayer for relief.  Yes, elsewhere, we claimed -- we

3   called them penalties.  Sometimes we called them statutory

4   damages.  We didn't know what to call them.  But our sort of

5   generic use of the term I don't think is binding on us in

6   terms of the policy because the policy language has to be read

7   specifically.

8       And the last thing I'll say on the policy language itself,

9   Your Honor, is -- and I have the copy of the *Flagship* case,

10  Your Honor, if you'd like it.  Actually, they have the

11  *Flagship* case.

12          THE COURT:  It's in their notebook.

13          MR. SBAITI:  Yeah.  They've already -- I have another

14  copy if Your Honor would like it, but I think he -- it's Tab 2

15  to their binder that they just gave you.

16          THE COURT:  Uh-huh.

17          MR. SBAITI:  The last thing I'll point out, Your

18  Honor, is, at best, counsel's reconstruction of this language

19  renders it ambiguous, and the ambiguity has to be construed in

20  our favor.

21      So even if his construction is a reasonable one, the

22  construction we'd offer is likewise reasonable, given the

23  *Flagship* case.  So at that point I don't think the Court would

24  be able to deny coverage, because, as Your Honor knows, the

25  tie goes to -- the tie always go to the insured, or the

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02772-X   Document 18-1   Filed 03/06/25   Page 253 of 274   PageID 5322

46

1  successor to the insured in this situation.

2      And I'll -- I think that's all I've got on the *Flagship*

3  issue, Your Honor.

4          THE COURT:  Okay.

5          MR. SBAITI:  We think it's pretty straightforward.

6      Turning to the assignment.  I'll start by saying, Your

7  Honor, I don't think the assignment issue affects -- it

8  definitely doesn't affect our *Stowers* claim, because we cite

9  the *Berkeley* case.  I've got a copy of that if Your Honor

10  would like it.  It's a Western District of Texas case, Judge

11  Sparks, that basically held non-assignment provisions in

12  contracts don't apply to *Stowers* claims.

13      I'm happy to approach, Your Honor.

14          THE COURT:  Okay.  You may approach.

15          MR. SBAITI:  I've got one that's tabbed.  Would you

16  like to put that in the tabbed version?

17          THE COURT:  Give her the tabbed one, yes.  Thanks.

18          MR. SBAITI:  Thank you, Your Honor.

19      So, setting the *Stowers* claim aside, talking about the

20  breach of contract case, I actually do have a -- I'll go ahead

21  and hand out the *Charter Schools* case, Your Honor.

22          THE COURT:  Okay.

23          MR. SBAITI:  I do have a copy of that.

24          THE COURT:  Okay.  Terrific.

25          MR. SBAITI:  Just take the cover page off.  This one

 1  isn't tabbed.

 2          THE COURT:  Thank you.

 3          MR. SBAITI:  The funny thing about this is my

 4  associate who originally briefed this case kept citing this

 5  *Charter Schools* case and I kept going, why does that sound

 6  familiar?  And it turns out I argued that case.

 7          THE COURT:  That's a sign you're getting old, when

 8  you don't remember.

 9          MR. SBAITI:  I was a little bit embarrassed.

10          THE COURT:  Okay.

11          MR. SBAITI:  But in reading it, it's very much

12  refreshed my recollection.  And the issues there, I think,

13  were pretty straightforward.

14      She actually did address Judge Clark's decision in *CVA* and

15  pointed out a few things.  Number one, the thread of cases

16  that Judge Cardone pointed out that makes -- that sort of

17  distinguishes between when is a contract still executory and

18  when is a contract not executory, one of the differences is

19  the difference between a terminated policy and an expired

20  policy.

21      And there's a couple of differences there, and if you'll

22  read -- and if you start looking at the threads of cases that

23  she followed -- this is what we argued down there as well --

24  is terminated policies means all obligations are terminated,

25  because they've been terminated for one reason or another.

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02775-X   Document 16-1   Filed 04/08/25   Page 255 of 274   PageID 5234

48

1   Expired policy just means that the period of coverage has

2   expired, but then there are tail obligations continuing.  And

3   she pointed out those tail obligations, under robust Fifth

4   Circuit precedent on what an executory contract is, those tail

5   obligations mean the contract is executory.

6        And she pointed out two, and I've got a third to add to

7   the list.  She pointed out that you have an obligation -- or,

8   the insured continuingly has an obligation to keep the insurer

9   informed and to cooperate in the prosecution of the

10  litigation.  And that those two residual obligations creates

11  -- means that it's executory, especially when they haven't

12  paid.

13       She also pointed out in that case that when there's been a

14  denial of coverage, the fact that that excuses the insured's

15  performance, if it's a material breach, the denial of coverage

16  being a material breach may excuse performance of some of

17  those residual obligations.  It doesn't mean that those

18  obligations don't exist as a matter of contract for the

19  analysis of whether it is an executory contract.

20       So, she is the only judge, by the way, of any of those

21  people, to actually go through very meticulously and look at

22  the specifics of what an executory contract is or isn't.  And

23  I think those things distinguish it sufficiently from Judge

24  Hale's opinion -- excuse me, Judge Clark's opinion in *CVA* that

25  they are relying on.

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02723-X   Document 8-3   Filed 01/09/25   Page 95 of 113   PageID 5275

49

1        This is a lot more like ours.  We had continuing

2   obligations under the CVA [sic] policy.  And I can go through

3   some of those, Your Honor.  And I'll add to the list.

4        So, there was a duty to inform in Section 21(b)(5).  A

5   duty for -- to cooperate, which is on Page 0039 of the exhibit

6   that they handed you.  By the way, I'm just looking at the

7   Bates number at the bottom right, for reference.

8        In 22(b) and 22(b)(1), there were -- there were

9   requirements to move forward and achieve a settlement.  And it

10  was a condition precedent of payment that all of these

11  obligations be fulfilled as a condition precedent to coverage.

12  And that was exactly the issue in the *Charter Schools* case,

13  Your Honor, that there was a condition precedent, and so

14  therefore, as long as the payment was outstanding, those

15  conditions precedent arguably, although excused by the

16  material breach, those conditions precedent still exist as a

17  matter of contract.

18       And the interesting thing is, Your Honor, is I have a

19  robust concession by them that this is true, because in their

20  answer one of their arguments why there's no coverage is we

21  didn't do everything we were supposed to do through the period

22  -- through the time that the case settled.  So they actually

23  highlight themselves in their answer ongoing obligations under

24  the policy that the insured hadn't fulfilled.

25       So I don't think they can have it both ways.  I don't

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02722-X   Document 18-1   Filed 04/16/25   Page 96 of 113   PageID 5126

50

1    think they can say in their answer, well, there is no coverage

2    because you didn't do everything you were supposed to do under

3    the contract.  And we'll debate whether those are excused by

4    material breach later, but that's their position in the

5    answer, but now they're telling you there was no obligations

6    at all.  They can't have it both ways.

7        And the third thing I would say, Your Honor, and this was

8    touched upon in *Charter Schools*, but she didn't have to reach

9    it, which is if the contract was completely done and there was

10   nothing left, then the argument metastasizes to them but it

11   evolves for us into the point that what was assigned to us

12   then wasn't a contract at all -- because according to them the

13   contract was completely gone -- it was simply a chosen action

14   for damages, for losses.

15       And so their non-assignability language doesn't touch upon

16   choices of action for breach of contract, or they don't even

17   -- they don't even brief why that would fall under the

18   language of the non-assignability, because the non-

19   assignability talks about an interest in the contract not

20   being assignable.

21       Well, there is at least a good enough argument that that

22   language wouldn't cover a chosen action after -- which is --

23   which is completely matured and accrued, which I think, you

24   know, which would be our position even if -- in an even-if

25   scenario.  Even if the non-assignability was there, then all

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02228-X   Document 16-1   Filed 05/13/25   Page 258 of 274   PageID 5297

51

1  we have is a pure chosen action.

2      That's a little bit different than *Charter Schools* because

3  in *Charter Sc*hools, like I said, we didn't have to get there,

4  and so Judge Cardone just avoided the question altogether.

5      I would also say --

6          THE COURT:  Let me ask you.

7          MR. SBAITI:  Oh.

8          THE COURT:  I meant to ask Mr. Timmins this.

9          MR. SBAITI:  Uh-huh.

10          THE COURT:  The Judge Leif Clark opinion where he

11  said it wasn't an executory contract, was that a terminated-

12  already-contract by the time it got into bankruptcy, or was it

13  an expired contract?

14          MR. SBAITI:  I believe it was a terminated contract,

15  but I'm --

16          THE COURT:  I think he used those words, which is --

17          MR. SBAITI:  Yes.  And that was -- that was why I

18  brought it up.

19          THE COURT:  Yes.

20          MR. SBAITI:  I was refreshing kind of on the fly as

21  we were -- as I was listening to Mr. Timmins' argument.  But I

22  -- I don't want to tell you something that's wrong.  I can

23  look it up.

24          THE COURT:  Okay.  It's Tab 4.

25          MR. SBAITI:  It's actually listed in Judge Cardone's

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02772-X   Document 1-3   Filed 04/08/25   Page 289 of 1274   PageID 5228

52

1  opinion --

2           THE COURT:  Uh-huh.

3           MR. TIMMINS:  -- when she lists -- when she sort of

4  distinguishes the two on Page 948 to 940 -- I think at 848 to

5  849.

6           THE COURT:  Well, I'll go back and read it, but that

7  may be meaningful.  I don't know.

8           MR. SBAITI:  And I'll be able to look at it in a

9  second.

10          THE COURT:  Maybe.  Uh-huh.

11          MR. SBAITI:  On Page 0039, Your Honor, there's also

12  -- I'm going to add to the list of what Judge Cardone said

13  were ongoing obligations.  There's a retention obligation,

14  Your Honor, which is to pay the retention amount before their

15  coverage would begin.

16      So that's three different ongoing obligations that would

17  render this an executory contract, Your Honor.

18      And so I think, I think in that case, Your Honor, there is

19  a pretty straightforward -- a pretty straightforward analysis.

20  I think Judge Cardone, like I said, is the only one to really

21  go through the law as opposed to I think -- I think where the

22  other cases have sort of stopped, no one's presented them,

23  with the vast majority of the cases they cite, I would say

24  even the Leif Clark decision, because it doesn't really

25  address the alleged ongoing duties of the insured, and that

53

1   was kind of the point that Judge Cardone was making.  You've

2   got to look at all these other obligations.  And the standard

3   for an executory contract is that any obligation on the part

4   of the insured that they still have to do as a material

5   provision of the contract, and the condition precedent to

6   coverage is how she defined the materiality of it, if it's a

7   condition precedent to coverage and they have to do it, then

8   how can you say this isn't an executory contract?

9       She's really the only one to take the legal issue there

10  and go, well, what's an executory contract?  And there was a

11  Fifth Circuit case -- I forget the actual one; there's several

12  of them -- but she cites one and goes, you know, these other

13  cases that say these aren't material are violating Fifth

14  Circuit precedent because they're applying a higher standard

15  of materiality than the Fifth -- or, of executory contract

16  than the Fifth Circuit preferred.

17      And so under 365(f), going back to the distinction that I

18  was arguing before, counsel tries to say, well, 365(f), you

19  know, has some kind of standard.  But if you look at the

20  language, it applies to expired leases and any other executory

21  contract.  And so expired -- so, the word expired, I think,

22  only applies to leases there, and an executory contract goes

23  up there.

24      And I think the interesting thing about an expired lease,

25  much like maybe an expired -- unlike an expired insurance

APP_096

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02728-X    Document 2    Filed 03/26    Page 100 of 273    PageID 520

54

1   contract, expired lease does vitiate pretty much all, you

2   know, all material obligations by operation of the law that

3   applies to leases.

4       So I think 365(f) also contemplated a much lesser standard

5   of what the mutual obligations still would be for an executory

6   contract to exist, being how it was written.

7       If Your Honor has any questions for me, I think I've --

8   oh, I was going to answer -- I was going to -- sorry, Your

9   Honor.  Returning back to the *Flagship* case, to address

10  counsel's last point, he said it was unpublished and not

11  precedential.  I think at this point, you know, the Fifth

12  Circuit and all the circuit courts do that, and then cite

13  their own unpublished nonprecedential opinions throughout.  I

14  mean, *Flagship* has been cited several -- several dozen times

15  by district courts.  You know, when you Shepardize it, it's

16  been cited a lot.  So, --

17          THE COURT:  I've been baffled for years on how to

18  deal with this, because I feel like I'm not supposed to cite

19  it, but then I do see other courts cite these cases that say

20  they're unprecedential.

21          MR. SBAITI:  It ends up all over the place.

22          THE COURT:  So it's a headscratcher for me.  Okay.

23          MR. SBAITI:  If Your Honor has any more questions for

24  me, I'll --

25          THE COURT:  I do not at this time.

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02728-X    Document 12    Filed 05/26    Page 101 of 173    PageID 523

55

1              MR. SBAITI:  Okay.  Thank you, Your Honor.

2              THE COURT:  Thank you.

3         All right.  Movant gets the last word.  So if you have a

4    short rebuttal, I'll hear that.

5              MR. TIMMINS:  I'll try and make it very short, Your

6    Honor.

7              THE COURT:  Okay.

8              MR. TIMMINS:  So, let me begin by addressing a couple

9    of the case law issues that came up.  In the *CVA* case, you

10   asked about the expiration or termination of the policy.

11             THE COURT:  Uh-huh.

12             MR. TIMMINS:  That -- the court used the language

13   terminated and expired in both of them.  In that case, the

14   facts were that the policy had expired.  It was a policy term

15   that ended in 1997.  The bankruptcy was filed in 1999.  So, by

16   the time the bankruptcy was filed, the policy had already

17   expired by its own terms.  It was not a situation where they

18   canceled the policy pre-term, as I understand it.

19             THE COURT:  Okay.

20             MR. TIMMINS:  While the Court was talking about --

21   when it was talking about other case law, it used the term

22   termination, I think, intended to be interchangeable with

23   expired policies.

24             THE COURT:  Okay.

25             MR. TIMMINS:  Secondly, with regard to the *Berkeley*

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02728-X   Document 2   Filed 06/06/25   Page 102 of 113   PageID 522

56

1   case and the general argument that the *Stowers* claim would

2   still be lurking out there:  The first point is, if the Court

3   determines that this is not loss because it's subject to the

4   civil penalties provision, the entire argument is moot,

5   because you can't have a *Stowers* claim if the underlying suit

6   is not covered.  Coverage is a prerequisite to *Stowers*.  And

7   so, you know, any request to amend to state a *Stowers* claim

8   would be futile if the Court has already determined there's no

9   coverage based on the civil penalties provision.

10       Secondly, the *Berkeley* case, as far as I know, is the only

11  case to have ever reached the conclusion that *Stowers* claims

12  can be assigned, notwithstanding -- and are not subject to an

13  anti-assignment provision in the policy.  The general rule is

14  that *Stowers* claims can be assigned, but not when there's an

15  anti-assignment provision.  The case law on anti-assignment

16  provisions in Texas is very extensive and very direct in

17  saying all causes of action are precluded by a valid,

18  enforceable anti-assignment provision.

19       *Berkeley* is the only case I've seen that creates an

20  exception to that for *Stowers*, and Berkeley is kind of a weird

21  case, because Berkeley was reversed by the Fifth Circuit on

22  other grounds.  And so its precedential value on that issue is

23  kind of questionable.

24       What makes it even more questionable is when the Court

25  made its a decision that the anti-assignment provision

APP_099

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02728-X   Document 2   Filed 06/25   Page 103 of 113   PageID 525

57

1   wouldn't apply to a *Stowers* claim, in the same breath it said,

2   I don't even know why we're talking about the *Stowers* claim

3   because it's not relevant to this case.  There's no basis for

4   a *Stowers* claim.

5        So everything the Court was saying on the *Stowers* issue

6   was dicta.  And you can see that in the Footnote 8 that's part

7   of the discussion about the anti-assignment provision in that

8   case, where the Court says, although the Court addresses the

9   issue of *Stowers* rights because the parties devote a fair

10  amount of time to the question, it seems irrelevant in this

11  case.  And it goes on to talk about the lack of any evidence

12  of there being an actual factual record to support the *Stowers*

13  case.

14       So I would suggest to the Court that the *Berkeley* case is

15  off on its own in stating this dicta that seems inconsistent

16  with the principles cited by virtually every other court in

17  Texas that's ever addressed the anti-assignment provision.

18       But on the *Stowers* claim generally, if the Court

19  determines that there's still a basis for the Plaintiff to be

20  able to assert a *Stowers* claim that should be amended, then I

21  would suggest that in that case the Court should allow them to

22  amend to state a *Stowers* claim and then we can then address it

23  in a dispositive motion on that particular claim if it still

24  remains.

25       But from my standpoint, once the Court determines that the

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02728-X    Document 2-2    Filed 06/03/25    Page 105 of 273    PageID 536

58

1    civil penalties carved out precludes coverage for this, that

2    moots all of the discussion about *Stowers*.  And I don't know,

3    frankly, that we disagree that that would be the outcome if

4    that's the Court's decision.

5        So, let me talk briefly about the civil penalties

6    provision.  And I want to -- I want to go back to the

7    discussion about the *Flagship* case.  And I want to harken back

8    to my point to the Court earlier that the usury statute is an

9    interesting statute that's more in the nature of the kind of

10   penalties that even the Court in *Flagship* was talking about in

11   the, you know, in the very limited construction of the term

12   penalties that was applicable based on that specific policy

13   language.

14       So that Court said, well, when we're talking about

15   penalties, we'll use this *Black's Law Dictionary* definition

16   that appears in, at least on the copy that's in the binder,

17   it's on Page 4 of the *Flagship Credit* opinion.  And that

18   definition says, Penalty is a punishment imposed on a

19   wrongdoer, usually in the form of imprisonment or fine,

20   especially a sum of money exacted as a punishment for either a

21   wrong to the state or a civil wrong, as distinguished from

22   compensation for the injured party's loss.  Though usually for

23   crimes, penalties are also sometimes imposed for civil wrongs.

24       So the Court -- the Court's reasoning played off of that

25   definition of penalty.  That definition of penalty sounds

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02728-X    Document 2    Filed 09/25    Page 105 of 113    PageID 523

59

1    exactly like we're talking about when we're talking about the

2    usury claims.

3        As I cited the Court earlier, when the Texas Supreme Court

4    talks about usury claims, it talks about them being a form of

5    punishment.  It's not compensation for damages that have been

6    incurred.  It is a form of punishment that's set by the

7    legislature by statute, and it's a formula under the Texas

8    Finance Code.  That is exactly what the *Black's Law Dictionary*

9    definition of penalty that the *Flagship Credit* court was

10   talking about means.  So if you apply that definition, this is

11   the kind of penalty that the *Flagship Credit* court was talking

12   about.

13       The other thing about *Flagship Credit* is, later on on that

14   same page, where the Court talks about the reasons that it

15   disagreed with the district court's opinion, that Court says,

16   The district court's analysis, which had reached the

17   conclusion that it was a civil penalty, is not unreasonable.

18   Where we disagree, though, is that by rejecting the canon of

19   construction, the court allowed all the possible meanings of

20   penalties to apply.  *Noscitur a sociis*, and I probably just

21   destroyed that pronunciation as well, is a traditional means

22   of limiting statutory or contract words from being given every

23   conceivable meaning.

24       That Court used the cannons of construction to conclude

25   that the term penalties within the phrase fines, penalties, or

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02728-X    Document 2-2    Filed 06/02/25    Page 107 of 273    PageID 538

60

1    taxes is limited to payments made to the Government, and so

2    that's why it disagreed with the district court.  But it --

3    what it was saying is the court's conclusion, the district

4    court's conclusion that this is a civil penalty is not the

5    conclusion that that Court could reach because that Court

6    decided under that particular policy language that penalties

7    couldn't mean all kinds of penalties.

8        In this case, we don't have that issue, because the policy

9    language here says civil or criminal penalties.  It's -- it

10    covers the entire universe of penalties.  And so you can't

11    have a situation where the *Flagship Credit* court is saying,

12    well, we're not going to assume that it covers all kinds of

13    penalties because we think it has to be more limited than

14    that.  It covers civil and criminal penalties.  There aren't

15    any other kinds of penalties.  It has to be one or the other

16    of those.  And the usury statute and the claims that were made

17    in this case fall directly within the carve-out language in

18    the CNA policy.

19        The last thing I will say on that, Your Honor, is it would

20    be an amazing conclusion if the decision we reached in this

21    case is that where an underlying claim specifically alleges

22    that they're entitled to recovery of civil penalties, that is

23    not subject to carve-out language in a policy that

24    specifically refers to civil penalties.  Where you have that

25    kind of match-up, it would be a novel interpretation and

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02728-X   Document 2   Document 1   Filed 06/06/25   Page 107 of 113   Page 273   PageID 537

61

1   conclusion that the carve-out language doesn't apply to the

2   exact same language that appears in the underlying lawsuit.

3       Now, the last thing I'll say, Your Honor, is on the anti-

4   assignment provision, the *CVA* case I think is worth a read,

5   and obviously in conjunction with the *Charter Schools* case,

6   because the *CVA* case does a fairly in-depth analysis of that,

7   of those issues.  And what *CVA* and the other cases that are

8   like it say is, when we're talking about executory contracts,

9   we're not talking about contracts that may have some lingering

10  obligations out there.  Applying the *Countryman* definition,

11  where there has to be kind of a mutuality of obligations, the

12  obligations that are relevant to the determination of whether

13  it's an executory contract are whether the policy is still in

14  effect, which was certainly not the case in this situation.

15  And, secondly, whether all premiums have been paid.  And it's

16  really the premium payment that most of the courts kind of go

17  off on on this issue.

18      And so where you've got a situation, as we do here, where

19  the policy has expired and all the premiums have been paid,

20  under the *Countryman* definition that's applied by the vast

21  majority of courts, there is no doubt whatsoever that that is

22  not an executory contract for purposes of 365(f).

23      Thank you.

24          THE COURT:  Okay.  All right.  I know we have

25  scheduling to talk about, but let me just start by thanking

APP_104

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02728-X    Document 2-1    Filed 06/02/25    Page 108 of 113    PageID 538

62

1    you for wonderful arguments, both of you.  I was a little

2    afraid yesterday afternoon when I started wading into this

3    that, oh, this is going to be boring.  You know, I'm a

4    bankruptcy nerd, as is my law clerk, and we like juicy

5    bankruptcy issues, and this looked like, oh, coverage.  But

6    these are some interesting issues, and you both did a

7    wonderful job clearly presenting them, so I don't feel at all

8    overwhelmed.  But we are going to, as you would want us to,

9    read all your cases and really think deeply about this.  So

10   it's not going to be in a couple of weeks that we get you an

11   opinion.  It's going to be several weeks, several weeks, so

12   that we try to get it right.

13       I'm also going to just briefly say that -- this sounds

14   unrelated, but it's not -- I am teaching *Creditors' Rights* at

15   SMU Law School.  In my second lecture, we're going to cover

16   usury, among other things.  So I've just been looking, and one

17   of my reactions that I was going to share with students is,

18   gosh, you would think I would deal with usury a lot as a

19   bankruptcy judge, but in 18 years I've barely had it argued.

20   I've had it argued before, but barely.  And I think one of the

21   reasons is you've got a couple of states out there where

22   there's basically no usury law, and so a lot of creditors

23   incorporate there and then they're not -- the ones that you

24   would think might be usurious, you know, credit cards or

25   whatever, it doesn't apply.  So we just see it rarely come up.

1    But now I'm going to tell them I had it come up just last

2    week.  It's in my second lecture, so it'll be next Wednesday,

3    but now I have a whole new -- of course, I'm not going to talk

4    about the case, but I'm going to say, guess what, it is an

5    issue.

6        So, with that, again, I really thank you for wonderful

7    presentations.  Wonderful.

8        With that, okay, I know we abated this a while, I guess

9    when you were -- maybe that was when you were trying

10   mediation.  I don't know.

11           MR. TIMMINS:  We abated it when we filed the Rule

12   12(c) motion, Your Honor.

13           THE COURT:  Okay.

14           MR. TIMMINS:  We just decided it was better to not

15   waste time on discovery --

16           THE COURT:  Okay.  So you were just abating discovery

17   and anything else?

18           MR. SBAITI:  There were deadlines coming up, and

19   rather than -- we wanted to move them anyway.  It just seemed

20   like addressing them after Your Honor addressed 12(c) made

21   sense.

22           THE COURT:  Okay.  All right.

23           MR. TIMMINS:  From a scheduling standpoint, Your

24   Honor, my suggestion, and I haven't talked with Mr. Sbaiti

25   about this, is that we just wait to see what the Court's

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02728-X    Document 3-2    Filed 08/26 67 Page 210 of 273    PageID 530

64

1   determination is before we do anything about scheduling.

2           THE COURT:  Okay.  I am fine with that.  A lot of

3   times I don't like to have, like, no scheduling order in

4   place, but I really am okay, because obviously it either goes

5   forward or it doesn't, depending on how I rule.

6           MR. TIMMINS:  Correct.

7           THE COURT:  So, --

8           MR. TIMMINS:  Correct.

9           THE COURT:  All right.  Well, we'll do our best.

10          MR. SBAITI:  And we're secretly hoping, if you go our

11  way, maybe we can settle the case and avoid it all anyway.

12          THE COURT:  Okay.  Well, I'm not going to comment one

13  way or another on that.  But, all right, so we'll --

14  certainly, I'm never offended if you all check in with my

15  courtroom deputy and say, hey, you know, where is she, is she

16  close, if you feel the need to know.  I don't get offended

17  when people do that.  But Courtney's in the middle of one

18  thing, and then -- she's my career law clerk.  But my term law

19  clerks are changing on Monday.  So I've got a new clerk coming

20  in Monday, and so I'm doubting I'm going to bombard her with

21  this.  I think Courtney will work on this when she's finished

22  with the one in the queue.  So it'll be several weeks.

23          MR. SBAITI:  Can I qualify the whole discovery thing

24  with just -- this actually doesn't affect them, but because

25  we're an assignee, we're actually having to chase a bunch of

APP_107

Case 23-03086-sgj    Doc 51    Filed 11/13/24    Entered 11/13/24 12:16:33    Desc Main
Case 3:24-cv-02728-X    Document 2-1    Filed 06/06/25    Page 112 of 113    PageID 533

65

 1   documents with subpoenas.  That is ongoing, and I just want to

 2   -- so, I don't think you've stayed the case, so I don't think

 3   I'm in violation of your order, or at least I really hope I'm

 4   not.

 5           THE COURT:  Okay.

 6           MR. SBAITI:  But because we have no deadlines, I

 7   think we're going to just continue with those, because there

 8   are documents that they've requested as well, so it's like

 9   attorneys' bills and things like that, from the prior lawyers

10   on our assignor's case.

11           THE COURT:  Okay.

12           MR. SBAITI:  So, --

13           THE COURT:  Any issue with that?

14           MR. TIMMINS:  We weren't going to buck them on that,

15   Your Honor.

16           THE COURT:  Okay.  So that can go forward.

17           MR. SBAITI:  Okay.

18           THE COURT:  We all agree.

19           MR. SBAITI:  Thank you.

20           THE COURT:  All right.

21           MR. TIMMINS:  Yeah, it's -- one of the other fun

22   things about this case is, if it goes forward in discovery,

23   we're going to be deposing a bunch of lawyers, I think.

24           THE COURT:  Oh, boy.  I know that's going to --

25           MR. SBAITI:  Lawyers always tell the truth, so it

Case 23-03086-sgj   Doc 51   Filed 11/13/24   Entered 11/13/24 12:16:33   Desc Main
Case 3:24-cv-02728-X    Document 2-1    Filed 08/06/25   Page 272 of 273    PageID 532

66

1   should be fast.

2           THE COURT:  Okay.  Thank you again, and we'll do our

3   best on this one.

4           MR. SBAITI:  Thank you, Your Honor.

5           THE COURT:  Okay.  Thank you.

6           THE CLERK:  All rise.

7       (Proceedings concluded at 11:16 a.m.)

8                           --oOo--

9

10

11

12

13

14

15

16

17

18

19

20                       CERTIFICATE

21       I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **11/13/2024**

24  _____    _____

25  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber

67

```
 1                              INDEX
 2    PROCEEDINGS                                          3
 3    WITNESSES
 4    -none-
 5    EXHIBITS
 6    -none-
 7    RULINGS                                             61
 8    END OF PROCEEDINGS                                  66
 9    INDEX                                               67
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

APP_110

000304